# EXHIBIT A

**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ANGELICA B. SMITH | § | |
| | § | |
| Price, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:22-CV-02472 |
| | § | |
| VALVOLINE, LLC | § | |
| | § | |
| Defendant. | § | |
| | § | |

**DECLARATION OF KEVIN MEYERS**

I, Kevin Meyers, do hereby swear, affirm and attest as follows:

1.      I am over the age of 18 and able to testify to the matters stated in this declaration. I make this declaration based upon my personal knowledge.  This declaration is given voluntarily. I have not been promised any benefit, coerced or threatened in any manner in exchange for the testimony in this declaration.

2.      I am the Manager NA Labor Relations for Valvoline.

3.      I am the primary human resources representative assigned to the La Porte facility, but I physically office in Ohio.    I have supported the La Porte facility since approximately February 2019.

4.      Angelica Smith is a former Valvoline employee at the La Porte, Texas facility.  Ms. Smith worked for Valvoline from March 2019 to April 2022.

5.      Valvoline provides employment opportunities to qualified individuals without regard to race, color, religion, sex, national origin, or any other personal characteristics that are protected by law. Attached hereto as Exhibit A-1 is Valvoline's Equal Employment Opportunity Policy.

1

6.      Valvoline is further committed to maintaining a work environment where people are treated with respect. Attached hereto as Exhibit A-2 is Valvoline's Anti-Harassment Policy. Valvoline does not tolerate the harassment of employees or applicants by anyone, including any supervisor, coworkers or non-employee.

7.      During Ms. Smith's employment, Valvoline maintained reporting procedures for employees who believe they have experienced or observed harassment. Employees could report the harassment to their immediate supervisor, any on-site manager, Valvoline's Employee Relations, and/or Valvoline's Employee Hotline. Each complaint was then handled by Employee Relations to conduct a complete investigation into the allegations.  If the investigation confirmed that Valvoline's policies have been violated, Valvoline took prompt corrective action, including discipline up to and including termination.

8.      On or about October 11, 2019, Angelica Smith made an internal complaint that a co-worker on a separate shift, Kevin Williams, groped her on two occasions and made other inappropriate comments. Valvoline immediately began an investigation into Ms. Smith's allegations.  Valvoline interviewed several employees, including Ms. Smith and Williams.  While Mr. Williams disputed the allegations, the Company determined that Ms. Smith's complaints were credible, and as a result terminated Williams' employment shortly thereafter. Attached hereto as Exhibit A-3 is Kevin Williams' termination letter dated October 18, 2019.

9.      On or about September 1, 2021, Plant Manager Frank Harris notified me that Ms. Smith made another claim of sexual harassment.  This time, she alleged that an unknown employee had touch her lower back/buttocks during a group shift meeting.   Ms. Smith requested that the video from the area be retrieved.  She reviewed it with onsite management and identified Material

Handler Eric Hawkins as the person that touched her.   Employee Relations was then notified of these allegations.

10.    Employees Relations then conducted an investigation into Plaintiff's complaint. Valvoline also suspended Hawkins pending the outcome of the investigation. Valvoline Employee Relations interviewed several individuals in conjunction with its investigation, including Ms. Smith, Mr. Hawkins, and Mr. Motz.   Ultimately, Valvoline Employee Relations verified Ms. Smith's allegations by reviewing the security camera footage, and then substantiated Plaintiff's complaint. In addition, the Company proactively moved Ms. Smith per her request to another area of the plant as she felt uncomfortable working in the same area.   As a result, Valvoline terminated Hawkins' employment two days later.   Attached hereto as Exhibit A-4 is Eric Hawkins' termination letter dated September 3, 2021.

11.    By virtue of my position, I have access to certain Valvoline records, including company policies and employee termination documents, among other documents. Exhibits A-1 to A-4 attached to Valvoline's Motion for Summary Judgment are true and correct copies of records kept by Valvoline in the regular course of business. It was in the regular course of business of Valvoline with knowledge of the act or event recorded to make, maintain, and/or transmit information thereof to be included in such records. The records were made at or near the time of the acts or events referenced in the documents, or reasonably soon thereafter. The records attached hereto are exact duplicates of the original.

PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE

LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND

CORRECT.

Executed on November \_6\_, 2023.

KEVIN MEYERS

4

# EXHIBIT A-1

Policy VL-POL-003.003 Equal Employment Opportunity
Doc No: VL-POL-003.003 Rev: 0
Uncontrolled Copy if Printed

# Equal Employment Opportunity

| | |
|---|---|
| **Policy Statement** | Valvoline, its commercial units and majority-owned or controlled subsidiaries ("Valvoline") provides employment opportunities to qualified individuals without regard to age, disability, genetic information, gender, national origin, race, color, religion, sexual orientation, gender identity, veteran status or other personal characteristics that are protected by law.  Opportunities for professional improvement and other terms and conditions of employment will be provided in a non-discriminatory manner, in compliance with Valvoline's policies and local, state and federal laws. |
| **Responsible Party** | Valvoline's Chief People and Communications Officer is responsible for implementation of, and amendments to, this policy. |
| **Scope** | This policy applies to Valvoline. |
| **Effective Date** | 01 March 2017 |
| **References** | The following reference documents apply to this policy: |

| Document Number | Document Title | Document Type |
|---|---|---|
| VL-POL-001.000 | Establishment and Application of Valvoline Policies | Policy |
| VL-POL-003.000 | Human Resources and Communications | Policy |
| VL-POL-003.001 | Anti-Harassment | Policy |
| VL-POL-007.004 | Reporting Obligations | Policy |
| REF-000039 | Notice of Equal Employment Opportunity Policy | Reference |
| REF-000088 | Global Standards of Business Conduct | Reference |
| REF-000004 | Glossary | Reference |

VALVOLINE (SMITH) 000071

# EXHIBIT A-2

Policy VL-POL-003.001 Anti-Harassment
Doc No: VL-POL-003.001 Rev: 1
Uncontrolled Copy if Printed

# Anti-Harassment

| | |
|---|---|
| **Policy Statement** | Valvoline Inc, its commercial units and majority-owned or controlled subsidiaries ("Valvoline") is committed to maintaining a work environment where people are treated with respect. In keeping with this commitment, Valvoline will not tolerate the harassment of employees or applicants by anyone, including any supervisor, co-worker, or non-employee. |
| **Definition of Harassment** | Harassment consists of unwelcome conduct, whether verbal, non-verbal or physical, that is based on a person's age, disability, genetic information, gender, national origin, race, color, religion, sex, sexual orientation, gender identity, veteran status, or other protected group status, and affects an individual's employment or creates an intimidating, hostile, or offensive working environment. |
| **Definition of Sexual Harassment** | Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:<br><br>• Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, or<br>• Submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual, or<br>• Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. |
| **Definition of Harassing Behavior** | Harassing behavior can take many forms, and can occur in both direct and indirect ways. Examples of unacceptable behaviors include, but are not limited to:<br>• **Written or verbal communications containing** sexual innuendo, suggestive or discriminatory comments, insults, threats, jokes about personal or physical traits, jokes of a sexual or demeaning nature, or sexual propositions.<br>• **Nonverbal communications, such as** making suggestive or insulting noises, leering, whistling, obscene gestures, threatening gestures, and the posting or possession at the workplace of literature, calendars or pictures that are suggestive, revealing, demeaning or pornographic.<br>• **Physical actions such as** unwelcome touching, pinching, brushing, rubbing or groping of the body, unnecessary closeness, threatening or intimidating actions, coercing sexual activity, and assault. |
| **Workplace Relationships** | A supervisor may not date or have any form of sexual relationship with an employee who reports through his or her management chain, even when the relationship is voluntary and welcome. Activity of this sort will subject all involved to disciplinary action, up to and including termination. |

Confidential

VALVOLINE (SMITH) 000072

| | |
|---|---|
| **Reporting a Problem** | It is every employee's responsibility to help maintain a work environment free from harassment.  Employees who believe they have experienced or observed harassment must report the harassment immediately to  Employee Relations and/or Valvoline's Employee Hotline at 1-800-VALVOLINE (1-800-825-8654) or outside the United States and Canada collect at 1-859-202-3865.

Each complaint will be handled by Employee Relations.  Although Valvoline must collect all relevant information as part of a complete investigation, every effort will be made to conduct the investigation on a confidential basis, with disclosure made only where there is a need to know.  If an investigation confirms that harassment has occurred, Valvoline will take prompt corrective action, including discipline up to and including termination. Decisions reached will be communicated to those involved. |
| **Retaliation is Prohibited** | Valvoline encourages employees to raise questions or concerns regarding harassment with Employee Relations. Valvoline will not authorize or permit any form of retaliation against any employee who has made a good faith claim or report of harassment, or against any employee who in good faith has provided information to Valvoline during the investigation of a claim or report of harassment. Employees who believe that they have been retaliated against should immediately contact  Employee Relations, or the Employee Hotline at 1-800-VALVOLINE (1-800-825-8654) or outside the United States and Canada collect at 1-859-202-3865. |
| **Responsible Party** | Valvoline's Chief People and Communications Officer is responsible for implementation of, and amendments to, this policy. |
| **Scope** | This policy applies to Valvoline except as follows:<br>• Employees who are subject to a collective bargaining agreement, to the extent the agreement contains provisions that conflict with this policy; or<br>• Employees working outside the United States, where local laws require different treatment.

**New York State:**<br>Valvoline has established the Sexual Harassment Addendum for New York State (VL-POL-003.033) for employees, applicants for employment, interns, whether paid or unpaid, contractors and persons conducting business, regardless of immigration status, with Valvoline in New York State. Where the provisions of the Addendum provide different or additional requirements than those provided under this policy, the provisions of the Addendum will apply |
| **Effective Date** | 09 October 2018 |
| **References** | The following reference documents apply to this policy: |

| Document Number | Document Title | Document Type |
|---|---|---|
| VL-POL-001.000 | Establishment and Application of Valvoline Policies | Policy |
| VL-POL-003.000 | Human Resources and Communications | Policy |
| VL-POL-003.003 | Equal Employment Opportunity | Policy |
| VL-POL-003.033 | Sexual Harassment Addendum for New York State | Policy |
| VL-POL-007.004 | Reporting Obligations | Policy |
| REF-000088 | Global Standards of Business Conduct | Reference |

Confidential                    VALVOLINE (SMITH) 000073

# EXHIBIT A-3

 [ SHAPE \* MERGEFORMAT ].

**Valvoline LLC**

October 18, 2019

1302 Wharton Weems Blvd.
La Porte, TX 77571

Office: 281.476.8350

Kevin Williams
**REDACTED**

valvoline.com

RE: Termination of Employment

Dear Kevin:

Please be advised your employment is terminated effective October 18, 2019.

This is due to your conduct concerning an allegation of sexual harassment towards another employee. The matter was investigated by our Employee Relations Department whereby it was determined your conduct to be inconsistent with the company's anti-harassment policy.

Please contact Valvoline Human Resources at 1-844-361-4466 regarding the disposition of your benefits.

Sincerely,




Jerry Precise
Plant Manager

VALVOLINE (SMITH) 000070

# EXHIBIT A-4



Frank Harris
**Plant Manager**

**Valvoline LLC**

La Porte, TX
valvoline.com

September 3, 2021

Eric Hawkins
REDACTED

RE: Termination of Employment

Dear Eric:

As you are aware an investigation has been conducted into allegations that you sexually harassed a coworker. The findings of the investigation were that you violated the company's Anti-harassment policy. As a result, your employment is terminated effective September 3, 2021.

If you have questions regarding the disposition of your benefits, please contact Valvoline Human Resources at 1-844-361-4466 option 3.

Sincerely,

Frank Harris
Plant Manager

          VALVOLINE (SMITH) 000059

# EXHIBIT B

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANGELICA B. SMITH | § | |
| | § | |
| Price, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:22-CV-02472 |
| | § | |
| VALVOLINE, LLC | § | |
| | § | |
| Defendant. | § | |
| | § | |

**DECLARATION OF ROBERT SHELTON**

I, Robert ("Rob") Shelton, do hereby swear, affirm and attest as follows:

1.      I am over the age of 18 and able to testify to the matters stated in this declaration. I make this declaration based upon my personal knowledge.  This declaration is given voluntarily. I have not been promised any benefit, coerced or threatened in any manner in exchange for the testimony in this declaration.

2.      I am the Plant Manager of Valvoline's Deer Park facility and have held that title since November 2018.  The Plant Manager of Valvoline's La Porte facility reports directly to me. Since February 2020, the La Porte facility Plant Manager has been Frank Harris.

3.      Angelica Smith is a former employee of Valvoline's La Porte facility.  During her employment, she worked as a loader/unloader.  In this role, Ms. Smith performed all warehouse and distribution related activities for domestic and international customer orders, including preparing and loading customer orders for shipment, receiving, storing and replenishing shipments, and conducting inventory accounts as requested.

1

4.      During most of her employment, Ms. Smith reported to Dalan Motz who held the title of Distribution Supervisor.  If Ms. Smith worked shifts other than her normal shift, her supervisor for that shift would be the Production Supervisor for that shift.

5.      In August 2019, I became aware of a complaint raised by Ms. Smith.  Ms. Smith alleged that she had been touched on her buttocks by co-worker Kevin Williams, and that he had made inappropriate comments to her.  Valvoline's Employee Relations was immediately notified of Ms. Smith's complaint, and they began an investigation. Mr. Williams denied the touching as well as the comments.  However, the Company believed that Ms. Smith's allegations were credible, and thus it made the decision to terminate Mr. Williams' employment. A true and correct copy of the termination letter issued to Mr. Williams is attached hereto as Exhibit B-1.

6.      By virtue of my position, I have access to certain Valvoline records, including company policies and employee termination documents, among other documents. Exhibit B-1 attached to Valvoline's Motion for Summary Judgment is a true and correct copy of a record kept by Valvoline in the regular course of business. It was in the regular course of business of Valvoline with knowledge of the act or event recorded to make, maintain, and/or transmit information thereof to be included in such records. The record was made at or near the time of the acts or events referenced in the documents, or reasonably soon thereafter. The record attached hereto is an exact duplicate of the original.

PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE

LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND

CORRECT.

Executed on November 7th, 2023.

ROBERT SHELTON

3

# EXHIBIT B-1

 [ SHAPE \* MERGEFORMAT ]

**Valvoline LLC**

October 18, 2019

Kevin Williams
**REDACTED**

1302 Wharton Weems Blvd.
La Porte, TX 77571
Office: 281.476.8350

valvoline.com

RE: Termination of Employment

Dear Kevin:

Please be advised your employment is terminated effective October 18, 2019.

This is due to your conduct concerning an allegation of sexual harassment towards another employee. The matter was investigated by our Employee Relations Department whereby it was determined your conduct to be inconsistent with the company's anti-harassment policy.

Please contact Valvoline Human Resources at 1-844-361-4466 regarding the disposition of your benefits.

Sincerely,

Jerry Precise
Plant Manager

VALVOLINE (SMITH) 000070

# EXHIBIT C

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANGELICA B. SMITH | § | |
| | § | |
| Price, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:22-CV-02472 |
| | § | |
| VALVOLINE, LLC | § | |
| | § | |
| Defendant. | § | |
| | § | |

**<u>DECLARATION OF FRANK HARRIS</u>**

I, Frank Harris, do hereby swear, affirm and attest as follows:

1.     I am over the age of 18 and able to testify to the matters stated in this declaration. I make this declaration based upon my personal knowledge.   This declaration is given voluntarily.   I have not been promised any benefit, coerced or threatened in any manner in exchange for the testimony in this declaration.

2.     I am the Plant Manager of Valvoline's La Porte facility and have held that title since February 2020.   I have reported directly to Rob Shelton, the Plant Manager for Valvoline's Deer Park facility, during my entire employment with Valvoline.

3.     Angelica Smith is a former employee of Valvoline.   During her employment at the La Porte facility, she worked as a loader/unloader.   In this role, Ms. Smith performed all warehouse and distribution related activities for domestic and international customer orders, including preparing and loading customer orders for shipment, receiving, storing and replenishing shipments, and conducting inventory accounts as requested.

4.     In September 2021, I became aware of a complaint raised by Ms. Smith.   Ms. Smith alleged that she had been touched on her buttocks by co-worker Eric Hawkins. Eric

1

Hawkins was a Material Handler. As a Material Handler, Mr. Hawkins would issue assignments to loaders/unloaders, but he was not a member of management or a supervisor.  He had no employees that reported directly to him.  He did not have the authority to hire, fire, or discipline any other Valvoline employee.  Mr. Hawkins was an hourly, non-exempt employee.   At the time, Mr. Hawkins and Ms. Smith both reported directly to Dalan Motz.

5.      Ms. Smith raised her complaint about Mr. Hawkins on or around September 1, 2021.   She was asked to write a statement concerning the events, which she did and is attached hereto as Exhibit C-1.   As her note indicates, the event occurred days earlier.

6.      On the very day that the issue was raised to my attention, I alerted Kevin Meyers (Human Resources) regarding the allegations so that the Company could begin an investigation. Video footage of the area where the incident occurred was pulled and reviewed with Ms. Smith. It substantiated Ms. Smith's allegations that she had been touched by Mr. Hawkins.  Mr. Hawkins was suspended pending further investigation, and Mr. Hawkins' employment was terminated effective September 3, 2021, just two (2) days after Ms. Smith reported the incident. A true and correct copy of the termination letter to Mr. Hawkins is attached hereto as Exhibit C-2.

7.      After Mr. Hawkins' employment was terminated, Ms. Smith brought to my attention that Mr. Hawkins had started a group text thread that included Ms. Smith.  The text message included a picture of Ms. Smith's behind in short shorts and had apparently been taken from her social media pages.  Nothing in Mr. Hawkins' text or in the photo identified the photo as being Ms. Smith or about Ms. Smith.  A true and correct copy of the text thread provided by Ms. Smith is attached hereto as Exhibit C-3.  Many of the phone numbers on the thread Ms. Smith brought to my attention were not associated with names and neither she nor I knew all of

the participants on the thread.   Ms. Smith believed that the other individuals on the text thread

were co-workers.   I advised Ms. Smith that I would remind co-workers of Valvoline's anti-

harassment policy at the next shift meeting, and advised her that she did not need to be present at

the meeting.   I also advised her to block the phone numbers on the thread and to delete or

"unfriend" coworkers from her social media account(s). I also told Ms. Smith that she should

report any further issues to my attention.    Ms. Smith made no further complaints to me

concerning this topic.

8.      Ms. Smith has alleged that a number of "lead men" were on the text thread.  Even

if true, lead men (also referred to as Material Handlers) are not supervisors.  They are hourly,

non-exempt employees.  They do not have direct reports and they are not reasonable for making

hiring, firing, or discipline decisions.

9.      After Ms. Smith's September 2021 complaint, I also moved Ms. Smith to work in

the kitting area of the facility.  This area was new to the La Porte plant, and it would allow Ms.

Smith to perform her job physically away from the coworkers she believed were on the text

thread.  Based on my observation, Ms. Smith did a great job working in the kitting area, and she

had indicated to me that she was happy in the position.  At all times she worked in the kitting

department, she was tasked with performing assignments that were consistent with her job duties

as a loader/unloader.  Ms. Smith never reported that she was asked to complete any assignment

that was not within her job description.

10.     While in the kitting area, Ms. Smith complained about attending the shift

meetings.  At the beginning of every shift, all Valvoline employees and temporary employees

that have job duties that involve loading and pulling, are required to attend a safety/tailgate

meeting.  During those meetings, Company manager discusses safety topics, complete stretching

3

exercises to mitigate or prevent injuries, conduct other training and discuss other workplace issues.  I explained that Ms. Smith was required to attend the meetings so that she could hear the safety-related issues, in particular.  Ms. Smith was free to stand or sit wherever she liked during the meeting.

11.     In late 2021, Ms. Smith took a leave of absence of approximately two (2) months. I am not responsible for approving leaves, and therefore, am unsure exactly why she took a leave of absence.   Given the length of time Ms. Smith had been out, Valvoline's policy required that she obtain a fitness for duty exam in order to return back to work.   When she originally returned, she had not been given the clearance to return to work as one of her medications purportedly made her drowsy and might have impacted her safety.   She was asked to secure the appropriate clearance to return to work, and after she provided the appropriate documentation, she was returned to work. Ms. Smith was not treated differently than any other employee returning from a similar leave.

12.     Dalan Motz, a Distribution Supervisor at the La Porte facility, announced his voluntary resignation in January 2022.

13.     Ms. Smith indicated that she had a car wreck in late-February 2022.  Her last day of work was March 9, 2022, and she did not return back to work as she was granted another leave of absence associated with injuries she sustained in the car wreck.

14.     On April 4, 2022, Ms. Smith texted me to indicate that she was resigning her employment with Valvoline.

15.     By virtue of my position, I have access to certain Valvoline records, including company policies, employee disciplinary histories, and employee termination documents, among other documents. Exhibits C-1 to C-3 attached to Valvoline's Motion for Summary Judgment are

4

true and correct copies of records kept by Valvoline in the regular course of business. It was in the regular course of business of Valvoline with knowledge of the act or event recorded to make, maintain, and/or transmit information thereof to be included in such records. The records were made at or near the time of the acts or events referenced in the documents, or reasonably soon thereafter. The records attached hereto are exact duplicates of the original.

PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on November 2, 2023.

FRANK HARRIS

# EXHIBIT C-1

9·1·21

on Thurday 26, 2021 we had a 2:00 meeting
in locker area For the L.A. And people came I Felt
someone someone grab me and didn't know who
it was because there was several people behind me.
afer a while i stood behind my forklift, till
it was 2:24 to dock out. Ask dailan Took look on
The camera To see if he seen anyting.



# EXHIBIT C-2

**Valvoline LLC**

Frank Harris
**Plant Manager**

La Porte, TX
valvoline.com

September 3, 2021

Eric Hawkins
**REDACTED**

RE: Termination of Employment

Dear Eric:

As you are aware an investigation has been conducted into allegations that you sexually harassed a coworker.  The findings of the investigation were that you violated the company's Anti-harassment policy.  As a result, your employment is terminated effective September 3, 2021.

If you have questions regarding the disposition of your benefits, please contact Valvoline Human Resources at 1-844-361-4466 option 3.

Sincerely,

Frank Harris
Plant Manager

# EXHIBIT C-3



SMITH 0001

EXHIBIT

5



SMITH 0002



3:49

8

10 People >

**Valvoline david** 🍺

Thank you

Today 3:31 PM

So we screenshot shit off my social media 😂 and everyone that's what to reply. Will give to HR and frank so thank you!!! I know it's nice 👍

**Willie**

Take me out of group

You already thought the shit was funny , keep that same energy

**Valvoline david** 🍺

take me out of this shit I have nothing to do with any of this

Nooo David, remember you said thank you.... I'm not playin with nun off y'all

**Willie**

How I suppose to know who that was this ain't got nothing to do with me I was brought in this group

**Valvoline david** 🍺

to taking me out of this shit i dont even know what is going on

Somebody put me in this group text i

Text Message

SMITH 0003



3:49

10 People >

**W** Take me out of group

You already thought the shit was funny , keep that same energy

Valvoline david 🍺
**V** take me out of this shit I have nothing to do with any of this

Nooo David, remember you said thank you.... I'm not playin with nun off y'all

Willie
How I suppose to know who that was this ain't got nothing to do with me I was brought in this group

Valvoline david 🍺
to taking me out of this shit i dont even know what is going on

**V** Somebody put me in this group text i didnt ask for any of this

Nooooo, keep the same energy y'all want to play and share shit off my media and think shit funny. I know you who y'all are because your number are save and the job already have them too... y'all want to talk and share. I'll do the same .thank you and have a great day at ValVoline 👋

Text Message

SMITH 0004

# EXHIBIT D

```
1                    IN THE UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF TEXAS
2                            HOUSTON DIVISION
3      ANGELICA B. SMITH                  )
                                          )
4                                         )
       V.                                 ) CIVIL ACTION NO:
5                                         ) 4:22-CV-02472
                                          )
6      VALVOLINE, LLC                     )
7
8
                            ORAL VIDEOTAPED DEPOSITION OF
9
                              ANGELICA SMITH
10
                             OCTOBER 9, 2023
11
12
13          ORAL VIDEOTAPED DEPOSITION OF ANGELICA SMITH,
14      produced as a witness at the instance of PLAINTIFF,
15      and duly sworn, was taken in the above-styled and
16      numbered cause on the 9th day of October, from 10:10
17      a.m. to 1:44 p.m., before Ardenia Hunt, CSR in and
18      for the State of Texas, recorded by stenography, via
19      Zoom videoconferencing, pursuant to the Federal Rules
20      of Civil Procedure and the provisions stated on the
21      record or attached hereto; that the deposition shall
22      be read and signed before any notary public.
23
24
25
                                                     Page 1
```

```
1                    A P P E A R A N C E S
2
      FOR PLAINTIFF:
3
            Mr. Lewis Zipkin
4           ZIPKIN WHITING CO, LPA
            3637 Green Road
5           Beachwood, Ohio 44122
            Email:  Lawsmatter@gmail.com
6
      FOR DEFENDANT:
7           Mr. Jeremy W. Hawpe
            LITTLER MENDLESON
8           2001 Ross Avenue, Suite 1500
            Dallas, Texas 75201
9           214-880-8100
            Email:  Jhawpe@littler.com
10
      VIDEOGRAPHER:
11          Joseph Acosta, Veritext
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
                                        Page  2
```

1    at Valvoline.

2              How did you find out about the position at

3    Valvoline?

4         A.    Indeed.com.

5         Q.    And did you have an interview?

6         A.    Yes, sir.

7         Q.    Do you remember who you interviewed with?

8         A.    No, sir.

9         Q.    I think I asked you this last time, Ms. Smith,

10   I can't remember the answer so I apologize.

11             When you joined Valvoline, was your brother

12   already employed or did he come after you?

13        A.    He came after.

14        Q.    When you applied to Valvoline, did you know

15   anyone from other jobs or just, you know, socially prior

16   to coming to Valvoline?

17        A.    No, sir.

18        Q.    And when you were hired, you were hired as a

19   Loader/Unloader; is that correct?

20        A.    Yes, sir.

21        Q.    And is that the position you have held the

22   entire time at Valvoline?

23        A.    Yes, sir.

24        Q.    And do you remember what you made at Valvoline

25   when you first started?

1      Q.    After Jeremy, who became your direct

2    supervisor?

3      A.    Dalan.

4      Q.    Dalan Motes?

5      A.    Yes, sir.

6      Q.    And was Mr. Motes your supervisor until you

7    resigned in April of '22?

8      A.    Yes, sir.

9      Q.    And, then, above Mr. Motes at some point Frank

10   Harris, the Plant Manager; is that correct?

11     A.    Yes, sir.

12     Q.    And Mr. Harris was not there when you were

13   hired in 2019;  is that right?

14     A.    No, sir.

15     Q.    As far as your working relationship with

16   Jeremy, do you feel like you have a good professional

17   working relationship with him?

18     A.    Yes, sir.

19     Q.    Were there any other supervisors, Ms. Smith,

20   that you reported directly to while you were at

21   Valvoline?

22     A.    No, sir.  Well, yes, sir.  I worked a short

23   period of time on night shift where my direct supervisor

24   was Tamika.

25     Q.    Did you have a good working relationship with

Page 23

1    Tamika?

2         A.   Yes, sir.

3         Q.   I'm going to show you on this screen, Ms.

4    Smith, I'm going show some exhibits.  I'm going to show

5    you the first one which is going to be Exhibit No. 1.

6              Do you see that, Ms. Smith?

7                   (Exhibit No. 1 marked.)

8         A.   Yes, sir.

9         Q.   And you're just going to have to tell me, Ms.

10   Smith, when you need me to scroll up and down because I

11   have the controls here.  But I'm just going to quickly

12   scroll through this so you see that this is the

13   complaint you filed in this lawsuit.

14             It's 6 pages and there is your electronic

15   signature at the bottom.  Do you see that?

16        A.   Yes, sir.

17        Q.   And this is when you were representing

18   yourself, pro se.

19             Who drafted Exhibit No. 1?

20        A.   Can you repeat that.

21        Q.   Yeah.  Who drafted exhibit No. 1?

22        A.   Exhibit No. 1?

23        Q.   So on your screen is --

24                   MR. ZIPKIN:  Objection.  You can

25   answer.

```
1          A.   May you repeat it?

2          Q.   (BY MR. HAWPE) Yes.  Do you see Exhibit No.  1

3     on your screen, Ms. Smith?

4          A.   Yes.

5          Q.   Who drafted it?

6          A.   Yes, sir.  I filed it.

7          Q.   That wasn't my question, ma'am.  I'm asking who

8     actually typed up this document?

9          A.   I did.

10         Q.   And, so, I want to jut kind of focus for a

11    second if we scroll through here to Page 2, you see

12    where it says "Fact and I First Incident of Sexual

13    Harassment."

14              Do you see that?

15         A.   Yes, sir.

16         Q.   And, then, the first instance of sexual

17    harassment is Paragraph 10 through 17.

18              Do you see that?

19         A.   Yes, sir.

20         Q.   And, then "II, Second Incident of Sexual

21    Harassment," that's from Paragraph 18 as I scroll

22    through here through Paragraph 38.

23              Do you see that?

24         A.   Yes, sir.

25         Q.   So I want to focus on the first instance before
```

Page 25

```
 1    we move to the second instance.  In Paragraph 11, you
 2    say Defendant employee "Kevin," and, then, "LNU made
 3    advances toward Ms. Smith which Ms. Smith politely
 4    declined."
 5          I think the gentleman's name is Kevin Williams.
 6    Do you know if that's correct?
 7    A.   I do not know the gentlemen's last name, sir.
 8    But I know his name is Kevin.
 9    Q.   And what was -- is Kevin a coworker of yours?
10    A.   Yes, sir.  He worked at export at the time.
11    Q.   Did you feel like you had a good working
12    relationship with Kevin?
13    A.   I believe so, yes, sir.
14    Q.   Just to clarify, when you said that he worked
15    in export, he was not your manager or supervisor ; is
16    that right?
17    A.   No, sir.  He was not.
18    Q.   In Paragraph 11, you say that he made advances
19    toward you which you politely declined.
20          Can you explain t us what these advances
21    entailed, like, what did he say?
22    A.   He would say that we will make pretty kids.  He
23    would compliment my back area, even tried to touch it.
24    And I told him "No."  He then asked if we could hook up.
25    And I also as well told him "No."
```

Page 26

1          Q.    Anything else as far as advances that he said

2     to you?

3          A.    No, sir.  I can't recall at this moment.

4          Q.    Were there any witnesses to these

5     conversations?

6          A.    Eric Hawkins, he was a witness.  And they also

7     had conversations about it as well.

8          Q.    And Eric Hawkins was a Material Handler; is

9     that correct?

10         A.    Yes, sir.

11         Q.    How many conversation do you believe that he

12    overheard when Kevin was making these type of comments

13    to you?

14         A.    I can't recall at this moment.

15         Q.    Was it more than one?

16         A.    Yes, sir.

17         Q.    And you said that Mr. Motes was a witness and

18    that they talked about it after, I think is what you

19    said.

20               Who were you referring to?

21         A.    Eric Harris will come up and he would just like

22    "Hey, you know, Kevin was bringing up that he was

23    interested."

24               And had pretty much discussing sexual acts

25    because of type of photos that I post online.

Page 27

1   Q. What type of photos is that?

2   A. At the time I was selling my clothes.  I was

3 selling swim wear.  And I would just post photos in my

4 everyday wear, bathing suit, dresses, lingerie that I

5 sold.

6     I took pictures to promote my stuff.  So yes,

7 sir.

8   Q. And Kevin made comments about these pictures to

9 you?

10   A. Yes, sir.

11   Q. What did he say about the pictures?

12   A. One of them were "I can see your private area

13 through your bathing suit."  Sorry.  I will post

14 pictures of my back area then he would make comments on

15 how the back shoots would be.

16   Q. And did he make these comments to you or was it

17 in a group setting?

18   A. The back shot comment were told to me by Eric

19 Hawkins.  But my private area to my bathing suit was

20 made to his direct comment.

21   Q. To you?  In other words, he made it directly to

22 you?

23   A. Yes, sir.

24   Q. Were there any witnesses to that conversation?

25   A. I can't recall at this moment.  But we were by

Veritext Legal Solutions
800-336-4000

1    the shipping desk.

2        Q.   And the comment about the backside, that is not

3    something he said to you but t he said to Mr. Hawkins;

4    is that correct?

5        A.   Yes, sir.

6        Q.   Was there any comments that Kevin said to you

7    that you felt were inappropriate?

8        A.   I can't recall at this moment.

9        Q.   In your lawsuit, in Exhibit No.  1, you

10   mentioned that he -- in the break room there was an

11   encounter where he tried to touch you.

12            Do you recall that?

13       A.   He didn't try to.  He did.

14       Q.   And also tell me about that incident?

15       A.   I was on my lunch break I started walking

16   toward the micro -- walking towards the fridge to get my

17   food.  And -- I'm sorry.  I walked towards the

18   microwave.  After I got my food out the fridgerator.

19            And I placed it in there shortly after he

20   walked in there.  And he comment about me looking good

21   today and my makeup looks good.  And, then, that's when

22   he started heating up his food.  And he walked behind

23   me.

24            He made a comment about my back area.  And,

25   then, he proceeds to put his hand on his love handles.

Veritext Legal Solutions
800-336-4000

1    After he did that, he grabbed me and put his private

2    area on me.

3           And that's when I turned around and pushed him

4    off of me.  And I told Eric Hawkins.

5        Q.   Is that the first time that Kevin had touched

6    you inappropriately?

7        A.   No.  Well, physically he touched me.  He tried

8    to -- I want to say a month earlier, I made a complaint

9    toward Eric that when I was walking out of the break

10   room, he walks in as I'm walking out, he was walking in.

11          And he tried to make a comment, like, I bet

12   I'll touch your ass.  And I said "No, you won't or I

13   will hit you."  And as the door was shutting, he tried

14   to hurry up and grab me.  And that's when I told Eric.

15       Q.   Other than this one incident in the break room,

16   did he ever touch you inappropriately?

17       A.   No.  Because after that I told Eric.  I told

18   Eric and EJ.  And both of them said "Well, this was the

19   second time that he tried to touch me.  But this time,

20   he actually did.  That we have to bring it up to HR."

21          And later that day, I wind up filing a

22   complaint and calling HR on Kevin.  So while I was

23   filing a complaint we were told not to interact with

24   each other.

25       Q.   So the first time that he tries to touch you

Veritext Legal Solutions
800-336-4000

 1    but doesn't; you said you relayed that to Eric Hawkins;

 2    is that right?

 3         A.   Yes, sir.

 4         Q.   What did Mr. Hawkins say in response this

 5    issue?

 6         A.   Hawkins wanted to -- he asked "Did I want to

 7    report it?"  I told Hawkins "No" at the time due to I

 8    didn't want to be responsible for someone losing their

 9    job.  At the end of the day, I know everybody has

10    families and mouth's to feed.  And I just told Eric if

11    you can have a conversation with him, to keep his hands

12    to himself.

13              The comments don't bother me.  I will try to

14    ignore them the best way I can.  I'm here to do a job.

15    But touching me, I don't like.

16         Q.   And do you know --

17         A.   And I made that very clear to Eric.  And Eric

18    said he had a conversation saying that it should get

19    better.

20         Q.   So Eric reported back to you that he had talked

21    to Kevin?

22         A.   Yes, sir.

23         Q.   And, then, I think just keeping the timeline

24    here, Ms. Smith, you said about a month later is when

25    this incident happens in the break room?

                                          Page 31

1          A.    Yes, sir.

2          Q.    The incident where he touched you in the break

3     room, were there any witnesses to that?

4          A.    No, sir.

5          Q.    After that incident happens, I think I

6     understood you, Ms. Smith, that then you go back to Eric

7     to complain about this; is that right?

8          A.    Yes, sir.

9          Q.    And Eric says at that point, HR needs to be

10    involved since he touched you; is that right?

11         A.    Yes, sir.

12         Q.    Then how do you get in contact with HR, did you

13    reach out to HR or did someone reach out to you?

14         A.    I can't recall at this moment.

15         Q.    Was the -- my understanding is that there at

16    the Laporte Plant there is no one from HR onsite; is

17    that right?

18         A.    Yes, sir.

19         Q.    And, so, any connection or contact that you

20    would have had with HR, I assume, would have been over

21    the phone; is that right?

22         A.    Yes, sir.

23         Q.    And, so, you do remember talking to somebody

24    from HR about this issue; is that right?

25         A.    Yes, sir.

                                              Page 32

1      Q.   Did you believe that your complaint was being

2  taken seriously?

3      A.   Yes, sir.

4      Q.   And do you remember if it was a male or female

5  from HR that you talked to?

6      A.   I cannot recall at this moment.  No, sir.

7      Q.   At some point you put together a handwritten

8  note or a little statement about what happened.

9           Do you recall doing that?

10     A.   May you repeat the question?

11     Q.   At some point you put together a handwritten

12  note about these events, do you recall putting that

13  together?

14     A.   Yes, sir.

15     Q.   And do you remember who asked you to write down

16  your statement?

17     A.   No, sir.

18     Q.   Other than -- and we will look at the statement

19  here in a second, Ms. Smith.

20          Other than your conversation with Eric about

21  the issue and then your conversation with HR, do you

22  remember if you had any other conversations with other

23  managers at Valvoline about this Kevin incident?

24     A.   I can't recall at this moment.

25     Q.   I'm going to show you what I have marked as

                                              Page 33

```
 1     exhibit No. 2.  And Exhibit No. 2 is Valvoline Smith 31.
 2             Do you see that on your screen?
 3                  (Exhibit No. 2 marked.)
 4     A.   Yes, sir.
 5     Q.   And is this your handwriting?
 6     A.   Yes, sir.  Yes, sir.
 7     Q.   You aware that Mr. Williams or Kevin Williams
 8     was terminated shortly after you raised this complaint?
 9     A.   Yes, sir.
10     Q.   And are you aware that he was terminated
11     because of your complaint?
12     A.   Yes, sir.
13     Q.   After you raised this issue to the company,
14     were you satisfied about how that complaint had been
15     resolved?
16                  MR. ZIPKIN:  Objection.  You may
17     answer.
18     A.   I didn't want him to lose his job.  I was upset
19     about that.  Yes, sir.
20     Q.   (BY MR. HAWPE) If you didn't want him to loose
21     his job, what did you want to happen in that situation?
22     A.   I just wanted to be respected.  And, for, like,
23     I even said this I didn't care if he had three days off
24     or a suspension.
25             I just didn't want him touching me.  I did feel
```

Page 34

```
 1    bad for him loosing his job because everybody has
 2    family.
 3         Q.   After you report this incident to HR, did you
 4    ever connect with Kevin about this situation?
 5         A.   No.
 6         Q.   Have you -- other than when you are in the
 7    moment and you are talking to you him and he's touching
 8    you, have you talked to Kevin about this issue at all
 9    since this incident happened?
10         A.   No, sir.
11         Q.   I'm going to show you back on the screen
12    Exhibit No. 1, that's the copy of your complaint that we
13    looked at.
14              Do you see that?  Do you see that on the screen
15    Ms. Smith?
16         A.   Yes, sir.  Yes, sir.
17         Q.   So I want to talk about the second -- what
18    you've called the Second Instance of Sexual Harassment,
19    which is like Paragraph 18 through 38 of your complaint.
20    And let's just go through these.
21              You say in Paragraph 19 that "On or about
22    August 5th, 2021, you were eating lunch with Eric
23    Harris."
24         A.   Right.
25         Q.   And the next paragraph you say "Mr. Hawkins
```

Page 35

1    offered to give Ms. Smith marijuana in exchange for

2    letting Mr. Hawkins grab Ms. Smith.  But Ms. Smith

3    declined."

4         A.  Yes, sir.

5         Q.  Was there any witnesses to that conversation?

6         A.   No, sir.

7         Q.  Prior to this incident, had you socialized with

8    Mr. Hawkins outside of work?

9         A.   No, sir.  But he asked several times.

10        Q.  You said he offered to give you marijuana.  Did

11   you tell him that you enjoyed marijuana?

12        A.   No, sir.

13        Q.  Did you use marijuana at this time?

14        A.   I can't recall at this moment.

15        Q.  Paragraph 21, "After Mr. Hawkins asked to touch

16   Ms. Smith's butt, Ms. Smith left the lunch area and

17   waited for a scheduled work meeting to begin.

18             While waiting for" -- Paragraph 22, "While

19   waiting for the work meeting to start Mr. Hawkins came

20   up to Ms. Smith from behind and grabbed her butt without

21   consent."

22             Did I read that correctly?

23        A.   Yes, sir.

24        Q.   I just want to be clear on this, Ms. Smith, at

25   some point you raised an issue that Mr. Hawkins had

                                            Page 36

1    touched you and asked the video be pulled; is that

2    correct?

3        A.    Yes.

4        Q.    I just want to make sure the timing is right.

5    As far as Mr. Hawkins touching your backside, did that

6    just happened just this once or was it multiple times?

7        A.    That happened just once.  And I was

8    disappointed because out of all people I thought he

9    would understand compared to the first incident that I

10   had and I confided in him.

11       Q.    So if I understand the setting here, there was

12   a lot of employees standing around waiting for this

13   meeting to go begin; is that right?

14       A.    Yes, sir.

15       Q.    And Mr. Hawkins comes up behind you and touches

16   your bottom, correct?

17       A.    Yes, sir.

18       Q.    And the video which we have produced to your

19   lawyer, seems as if at first you don't know who just

20   touched you, and you are looking around; is that right?

21       A.    Yes, sir.

22       Q.    And you see that it is Mr. Hawkins, right?

23       A.    Yes.

24       Q.    Did he make any comments when he was touching

25   you?

Veritext Legal Solutions
800-336-4000

```
1      A.   No.  He just laughed.  And I just laughed and I
2   got uncomfortable.  And I removed myself from that
3   situation.
4      Q.   And -- okay.  And at some point, you raised
5   this issue to a manager about being touched, correct?
6      A.   Yes, sir.
7      Q.   Who did you first go to to report this issue?
8      A.   I went to Dalan.
9      Q.   And, so, you went to Dalan and what did you
10  tell him?
11     A.   I asked him were there cameras -- and he said
12  "How come?"  I said "I felt as if someone touched my" --
13  At the time I told him "ass."  I said it was "Three
14  people behind me.  It was Darius, EJ, and Eric."  And I
15  said I don't know who it was.  But I asked him if could
16  he pull the cameras so he can see who it was.
17         And from there we can wind up recording it.
18  From the time that I told him about the incident, he did
19  not do nothing.  I had to work with Eric for two days
20  and his attitude because I rejected him.  And that's
21  when I asked Tamika for help.
22         I came in my next shift, I told her about the
23  situation that is someone grabbed me while we were at
24  the meeting.  And I asked "Were there cameras?"  And she
25  said "Let's go to the restroom."  Me and Tamika walked
```

Page 38

1    to the rest room.

2         She pulled up the cameras right then and there.

3    And she asked me "What was the day that we had the

4    meeting?"  I told her "Thursday" but the meeting was on

5    Friday.  So she couldn't see it.  But she said the

6    following morning, she said "Come into my office and

7    we'll go ahead and look over the cameras to see if we

8    can figure this out."

9         By the time me and Tamika walked out of the

10   bathroom, Dalan was standing there.  And he just looked

11   at us.  And he said "Are you going make it to the

12   morning meeting.  I said "Yes."  And I walked out.  And

13   that was it.  Later on that evening, that's when Dalan

14   pulled me aside and said "Hey, let's go look at the

15   cameras."

16        But I felt -- I felt kind of angry because like

17   why did it take for me to go to another supervisor for

18   you to help me.  I'm telling you someone grabbed me and

19   at this point I kind of knew it was Eric because of the

20   mistreatment.  And I had to sit here and work with him

21   that whole time while he did nothing.

22   Q.   So I just want to clarify a couple of things.

23   Let's just step back for a moment.  This meeting

24   happened where Eric touches you, you said then you

25   reported that to Dalan.

1          Did you report that to Dalan on the day that it

2    happened or some time there after?

3          A.    No, sir.  I reported it the next -- the

4    following day.  Because it happened on the Friday.  I

5    went to him -- so we had Monday and Tuesday -- I mean

6    Saturday and Sunday.  And when we made it back to work

7    on Monday, I wind up pulling him and telling him that at

8    the end of the shift.

9          Q.    So when you tell, you know, Dalan that this had

10   happened and ask that he pull the video, what was his

11   response?

12         A.    He said "Okay."  He said "Do you know who it

13   was."  I said "No."  I was pretty much told him it was

14   Darius, EJ and Eric who pulled up in the golf cart

15   behind me.

16         And he just said "Okay.  I'll get to it." And

17   that was it.

18         Q.    Anything else that you can remember out of that

19   conversation with Dalan?

20         A.    Not at this moment.

21         Q.    And, so, just so I understand this timeline

22   right.  You said that this meeting where this happened,

23   happened on the Friday, right?

24         A.    Yes, sir.

25         Q.    And you said it was at the end of the shift?

                                                    Page 40

1     A.   Yes, sir.

2     Q.   And so then you would have normally had

3 Saturday and Sunday off; is that right?

4     A.   Yes, sir.

5     Q.   And, then, you show back on Monday and worked

6 the entire day?

7     A.   Yes, sir.  Because Monday is pretty heavy -- on

8 a Monday.  And it's just like they are steady pushing

9 for  you to push out orders, get your orders complete.

10 And I was already on my last straw with Dalan with not

11 completing orders -- well, not completing other people

12 orders, where he had an issue.

13          So I was really trying to get my work done.

14 And, then, I made the complaint.

15     Q.   So you talked to him at the end of shift on

16 Monday and asked him to pull the video.

17          When do you talk to Tamika about this issue?

18     A.   Two days.  So if it was Monday, around Thursday

19 I talked to Tamika.

20     Q.   And she pulls the video while you were in front

21 of her?

22     A.   Yes, sir.  She pulled it up on her phone.  And

23 she asked me what was the time and date.

24     Q.   And you said originally it was Thursday and she

25 didn't see anything.  And, then, you remembered it was

Page 41

1    on Friday, right?

2        A.   Yes, sir.

3        Q.   So -- it's just you and Tamika looking at the

4    video on her phone?

5        A.   Yes, sir.

6        Q.   And is that was when you were able to identify

7    that it was Eric?

8        A.   No, sir.  At the time, I was running late for

9    my morning meeting.  So we couldn't find the timing

10   since everybody was there doing the -- meeting she said

11   when you come tomorrow first thing in the morning, we're

12   going to look again on the cameras.

13       But she said "Don't be late towards you meeting

14   because Dalan is going to complain."  And sure enough,

15   by the time we walked out the bathroom there Dalan was.

16   Just standing at the end of the hallway.

17       And he just looked at both of us and he stated

18   "Was I going make it to the morning meeting?"

19       Q.   And did you make it to the morning meeting?

20       A.   Yes, sir.

21       Q.   When you talked to Dalan at the -- well, I want

22   to pick back up on the timeline.  So  You have a morning

23   meeting.

24       But then you have another meeting with Dalan

25   about the video; is that right?

Page 42

1          A.    Yes, sir.

2          Q.    And do you remember what day of the week that

3     was?

4          A.    It was that same day.  The day that he saw me

5     and Tamika walk out the restroom.

6          Q.    Sure.  And, so, do you go to his office or does

7     he come to you?

8          A.    First, I was at the shipping office.  I believe

9     I was at the shipping office.  And he comes up to me and

10    he was just like do you have a moment I say "Yes, sir."

11    He was like "Okay.  Well, get on the golf cart."

12          And we wind up driving towards the front

13    office.  From there, we walked in the office I recall

14    Darius being right behind us as we're walking to the

15    office.  And from there, I walked through there.  And he

16    starts walking towards, I guess, the lunchroom in that

17    office, that you should call it.

18          And, then, in there is also a control room,

19    which I guess accesses the cameras in the warehouse.  I

20    tried -- he said "Okay.  We are going to look at the

21    cameras."  I tried to close to door 'cause as he's

22    talking I notice Darius is looking the whole time that

23    Dalan is talking.

24          And I tried to shut the door, Dalan looked at

25    me and said "No, leave it open."  And from there, as we

                                                    Page 43

1    are going through the videos Darius is watching.  And

2    we're just pretty much rewinding back and forth through

3    the videos until Dalan sees that Eric grabbed me on

4    camera.

5        Q.   And after you identified that this is Eric and

6    you see it on camera, was there any other discussion

7    with Dalan about this incident?

8        A.   He said that "I'm going have to give a

9    statement."  And he looked at me and said that "I am

10   going to get Frank so he can loop him into the

11   situation."  And he left out the room.  He got Frank.

12            He came back with Frank.  He played the video.

13   Only thing Frank could do was put his head down.  And he

14   made a recording on his phone.

15       Q.   I'm going to show you briefly what I think is

16   going to be Exhibit No. 3.  Share screen here.  Exhibit

17   No. 3 is Valvoline Smith 44.

18            Do you see that?

19            (Exhibit No. 3 marked.)

20       A.   Yes, sir.

21       Q.   And this is a statement that the top date says

22   September 1st, '21.  And is that your signature at the

23   bottom?

24       A.   Yes, sir.

25       Q.   I want to ask you the -- stop sharing just for

                                              Page 44

```
 1    a second here.

 2           You said after this incident happened with Mr.

 3    Hawkins, you continued to work with Mr. Hawkins for a

 4    few days, correct?

 5         A.   Yes, sir.

 6         Q.   And I thought you suggest that Mr. Hawkins was

 7    treating you differently in those few days; is that

 8    right?

 9         A.   Yes, sir.

10         Q.   How was he treating you differently?

11         A.   He was taking other people workloads and

12    handing it to me.  I was usually in charge of R&L,

13    loading the truck.  And, pretty much, when I was done

14    with my work, he would say "Oh, well, they are falling

15    behind or they got to go.  I need you to finish their

16    order."  And he was just keep hitting me with orders.

17           And he was just like "You just been

18    bullshitting.  I asked you to go out and you go out with

19    everybody else but you don't go out with me."  I told

20    him "I don't have a baby sitter."  That was the lie I

21    told him why I could not go out.  I didn't have no one

22    to watch my child.

23           And he got upset with me after that.  And it

24    got to a point where I told EJ and I broke down crying.

25    I was on the forklift and EJ stopped was like "Are you
```

Page 45

```
 1    okay?"  I was like "No. I'm tired."  I told him "I was
 2    tired."
 3            I said everyday I shouldn't have to come to
 4    work being harassed by someone.  Everyday I have a
 5    comment "Oh, your ass is eating your shorts.  When can I
 6    fuck you in your ass."  I said "That shit gets tiring
 7    hearing that everyday."  And I said "Just because I
 8    didn't go out with him, he is giving me other people's
 9    work and putting a lot of pressure on me.
10            And I'm getting written up if the work is not
11    completed."  I was just like -- I told EJ "I'm tired.
12    Like, I don't even want to be here anymore."  And EJ was
13    like "I need to report it."
14            And I started telling EJ -- I did tell EJ about
15    the situation of someone grabbing me because I felt that
16    EJ should have known because he drove up in the golf
17    cart with Eric, with Eric and Darius.  But he said he
18    didn't know nothing about it.
19            And that I should make a report.  And that's
20    when I did.
21       Q.   You said that Mr. Hawkins had made comments to
22    you that you repeated a minute ago, how many times did
23    he make comments like that to you?
24       A.   A lot.
25       Q.   It wasn't everyday, was it?
```

Page 46

1        A.    Yes.   It was.   And you can even ask others.

2   Because he wasn't shy about it.   He made it -- he let it

3   be known that he was not shy about it.   Everyday he will

4   come into work, pull out his phone and show people who

5   he will have sex with or who he meet offline or who he

6   met from a freaking homeless shelter.   It was a everyday

7   thing with Eric.

8        Q.    But my question is:

9              Was it everyday that he made comments about

10  you?

11       A.    Almost everyday, yes, sir.

12       Q.    There weren't any witnesses to those

13  conversations?

14       A.    I can't recall at this moment.

15       Q.    Why did you not report you when he made these

16  comments?

17       A.    'Cause I was already having issues with Dalan.

18  I already made one report about Kevin.   It was just like

19  I didn't believe anybody was going to believe me.

20  Everybody is associating me with -- Dalan and Eric were

21  pretty much best friends.

22             And it was just getting to a point where I just

23  kept my head down and was trying to do any work because

24  I have a child.   It was just like I was scared to loose

25  my own job.

                                             Page 47

1      Q.   You said that you were concerned that they

2   wouldn't believe you, but they believed you when you

3   raised the issue about Kevin, didn't they?

4      A.   That's Kevin.  But when I start making

5   complaints towards Dalan of the mistreatment, it was

6   not.  It was pretty much his word over mine.  And it

7   just made that situation very hard.

8           It was very hard to even go to Dalan about this

9   situation knowing that were already not on the same

10  page.  And he felt that I was intimidated by him.

11     Q.   What --

12     A.   It was hard to go to him.

13     Q.   What other complaints did you make to Dalan?

14     A.   The mistreatment.  The mistreatment of how he

15  was treating others that were not like me.  He would get

16  on me everyday and about my PPE.  I said "Okay."  I get

17  written up.  I'm just like how come I'm getting in

18  trouble for all of this, but yet they're doing the same

19  thing and you're not saying nothing.

20          He's literally walking past them, "Oh, you

21  don't have no Plexiglasses.  Here you go, I'll give it

22  to you."  I ask him for safety glasses, he gives me the

23  run around.  "Oh, I can't find the key to the safety

24  lock.  Oh, we all ran out we got to order some more."

25          Or I even got written up for not having my

1    proper PPE.  It was just like that was the complaints I

2    was making.  And even when I would call him on the

3    radio, I was like"Dalan" trying to get information on

4    the work load.

5           He would not answer me on the radio.  I'm like

6    "Dalan, I called you several times over the radio," he

7    would not answer for me.  But when someone else calls

8    his name, he's like "Oh, did someone call for me?  Okay.

9    I'm about to head there."  It was like making my job

10   difficult to be there because you have a man being

11   selfish and childish or I don't know what his issue was

12   with me.

13          And I made them type of complaints.  Even when

14   they had a safety walk through they was -- everything

15   we'll clean up the warehouse.  They had a safety walk

16   through.  And, I guess, the door was propped open

17   because somebody was smoking a cigarette outside.  At

18   the time, Eric Hawkins was involved in that safety walk

19   through.

20          And he informed me that Dalan through me under

21   the bus by saying Ming that "Hey, that door is probably

22   propped open because Angelica left it back here so she

23   can smoke.  I've been telling her several times not to

24   do this.  We're going to get on her about it."  And I

25   brought that up to Frank attention.

1          And when I did, I told Frank, "I don't feel the
2     need if I was not back there, that was not my work area.
3     Why would you discredit me like that?"  And Frank was
4     like "Let me call Dalan in here."  He calls Dalan and he
5     tells him about the situation.
6          And the only thing Dalan kept saying was "Who
7     told you this?  Who told you this?  Where you get this
8     information from?"  And I said "Eric Hawkins."  And he
9     said "Okay.  I'll deal with it later."
10          And I was dismissed out of the office.  So it
11     was a lot of mistreatment from Dalan.
12     Q.   Have you told me all of the ways that you
13     believe Dalan mistreated you?
14     A.   No, sir.  I don't believe so.
15     Q.   How else did he mistreatment you?
16     A.   When I told him that my schedule was getting
17     kind of hectic with school and the therapy with the
18     doctors and there was an opening coming up with first
19     shift.  I was supposed to be the next in line for first
20     shift.
21          And at the time, the school accepted my offer
22     and said that I needed -- I have a week to let them know
23     if my stuff would be able to go.  And I told Dalan I
24     said "Am I next for first shift?"  He said "Yes."
25     Shortly after, he wind up hiring someone and ended up

                                              Page 50

```
1    putting them in the first shift position talking about

2    they are just there temporarily for school.

3            I wind up loosing that spot in the day

4    care/school for my child -- I wind up loosing that spot.

5    And I told Dalan about it and I was just like "It's

6    going to be hard to work this shift I didn't -- because

7    I don't have that spot anymore." I lost it because he

8    gave that spot to someone else instead of me that was

9    next in line.

10           And Dalan was like "Well, my only is solution

11   is for you to go night shift."  And I wind up having to

12   go night shift when I was supposed to go on day shift.

13   And that's when I started working under Tamika.

14       Q.   But that was only temporarily, right?

15       A.   No.  I had to stay on night shift until another

16   spot on day shift was open.

17       Q.   And how long was that?

18       A.   I can't recall the -- my length of time that I

19   was working on night shift.  I know it was a couple of

20   months.

21       Q.   And then you went to day shift?

22       A.   Yes, sir.

23       Q.   The timing on this, did this occur before the

24   issue with Eric that we just talked about with the

25   touching or after?
```

Veritext Legal Solutions
800-336-4000

1          A.   Before the issue with Eric.

2          Q.   What other ways do you believe that Dalan

3     mistreated you?

4                    MR. ZIPKIN:  Excuse me.  Did you

5     understand that question, Ms. Smith?

6                    MR. HAWPE:  Is that an objection Lew, I

7     mean, I don't know what --

8                    MR. ZIPKIN:  I didn't understand the

9     question, Jeremy.  I apologize.  Can you clarify that?

10                    MR. HAWPE:  That's fine.  That's all I

11     need.  So I will ask the question again, Ms. Smith.

12          Q.   (BY MR. HAWPE) What other ways do you believe

13     that Dalan mistreated you?

14                    MR. ZIPKIN:  No.  It was the question

15     before that Jeremy?

16                    MR. HAWPE:  Well, this is my question now.

17                    MR. ZIPKIN:  I object. Go ahead.  What is

18     your question now?

19          Q.   (BY MR. HAWPE) For the third time, Ms. Smith,

20     have you told me all the ways Dalan mistreated you?

21          A.   No, sir.

22          Q.   What other way did he mistreat you?

23          A.   I can't recall.  There are other ways he

24     mistreated me.  But I can't recall at this moment.

25          Q.   Is there anything that you could review that

Page 52

1      would refresh your memory?

2          A.    No, sir.

3          Q.    Picking back up on the timeline here, after

4      Dalan shows the video to you, what happens next?

5          A.    From there, that's when Frank walked in.  He

6      takes the video of the recording on the phone.  I --

7      they took me to the conference room that is located

8      inside of the office.

9              They contacted HR.  Frank contacted HR to my

10     best knowledge that I know.  And I was in the conference

11     room writing a statement.  And Frank walks in and hands

12     me a sticky note saying that "A lady from HR will be

13     reaching out to me.

14         Q.    And did the lady ultimately reach out to you or

15     connect with you?

16         A.    Yes, sir.  And I gave her my statement.  She --

17     we had the conversation of how we got to situation now.

18     And pretty much why did I wait until now to report it.

19             And I told her pretty much the whole story.

20     And from there, it was under investigation.

21         Q.    And at some point during that -- well, do you

22     remember the person you talked to was a woman by the

23     name of Cindi McCloskey?

24         A.    I can't recall at this moment.  No, sir.

25         Q.    Do you recall telling someone from HR that you

1    had audio recordings of Dalan?

2        A.   Yes, sir.

3        Q.   But you never provided those, did you?

4        A.   No, sir.  Because --

5        Q.   Why?

6        A.   Because the way the HR lady was making me feel

7    as if I was targeting them, it didn't made me feel like

8    she was on my side.  So I didn't trust her.

9        Q.   And she said --

10       A.   And when I told her she said "Did you let Dalan

11   know that you were recording him."  And I said "I didn't

12   think I have to if I'm the one that feels threatened."

13       Q.   You felt threatened?

14       A.   Yes

15       Q.   Was Mr. -- was Dalan saying things that you

16   believe were threatening?

17       A.   Dalan -- Dalan-- I didn't trust him.  And, yes,

18   he made me feel threatened with his behavior.  And

19   especially when I'm trying to sit down and eat lunch.

20   And he walks in there and he says "I've been getting a

21   vibe that you are intimidated by me.  And, if so, why?"

22            Like, that was unprovoked.  I didn't speak to

23   him.  The only thing he did was walk in a room and just

24   said that "He's getting the vibe that I'm intimidated by

25   him."  He had conversation with others throughout the

Page 54

1    warehouse that he is a gun owner.

2          And that he packs his gun even in his car on

3    the job property.  Him making comments with the guys.

4    He said "Oh, I don't fight.  I'd would rather shoot."  I

5    understand.  But what type of conversation is that to

6    have at work?  So, yes, I was threatened by Dalan.  I

7    did feel threatened by Dalan.

8          Q.   Have you told me all the ways --

9          A.   And that's why --

10         Q.   Sorry.  There's a little bit of delay.  I

11   didn't mean to interrupt you.  Go ahead and finish.

12         A.   Yes, sir.

13         Q.   Have you told me all the ways that Dalan

14   threatened you?

15         A.   I said I felt threatened.  But, no, sir.

16         Q.   What other ways did he make you feel

17   threatened?

18         A.   I can't recall at this moment.

19         Q.   You said that he approached you and said "I

20   feel like your vibe is that you are intimidated by me"

21   or something along those lines; is that right?

22         A.   Yes, sir.

23         Q.   Were you intimidated by him?

24         A.   No.

25         Q.   What was your response when he makes that

Veritext Legal Solutions
800-336-4000

1    comment to you?

2         A.   My response was, I don't know what would make

3    you feel that way.  And I just told him pretty much that

4    at that time I was having an issue with another coworker

5    and pretty much making my job difficult to unload

6    trucks.  And we were having an issue.

7              And I brought that to Frank's attention.  And

8    he should be handling it.  And he was like, "Oh, I

9    thought it was just me. And, then, he just giggles and

10   walked off.

11        Q.   Who was the don't coworker that you were

12   referencing just now?

13        A.   It was a lady.  I can't remember her name at

14   this time.

15        Q.   What was the issue that you were having with

16   her?

17        A.   That's when we had to use scanners.  And I

18   didn't have a scanner.  I was told to go get a scanner

19   from her.  And she was working with a temp agency that

20   we hire through the warehouse.  And when I tried to go

21   collect her scanner as I was told through my lead man,

22   she called her supervisor from the temp services.

23             And was just like "I'm not giving it to her.

24   She can go take it from somewhere else.  I need this, I

25   need this."  And she was very disrespectful towards me.

Page 56

1          And I informed them of that.  And I said that

2     "Just because she has an issue with me does not mean she

3     can take it out on me and not give me the scanner for a

4     job that I have to do."

5          And we had got into an altercation.  I brought

6     it to Frank's attention.  And we didn't work together

7     for a while.

8     Q.   Are there any other way that is you felt

9     intimidated by Dalan?

10    A.   I can't recall at this moment.

11    Q.   Did Dalan ever make any sexual comments to you?

12    A.   No, sir.

13    Q.   Did he make any comment about you being a woman

14    or being female?

15    A.   No, sir.

16    Q.   Let's just do one more exhibit.  And I could

17    use a quick break.  I'm going to show you what I have

18    marked as Exhibit No. 4.  This is Valvoline Smith 32.

19         Can you see that email?

20              (Exhibit No. 4 marked.)

21    A.   Yes, sir.

22    Q.   This is an email from Ms. McCloskey to your

23    gmail account.  The angelica.bria.smith@gmail.

24         Is that your personal email account?

25    A.   Yes, sir.

Veritext Legal Solutions
800-336-4000

1          Q.   And did you receive Exhibit No. 4?

2          A.   Yes, sir.

3          Q.   And, in here, it says the second sentence,

4     "According to our discussion, and here's my email

5     address to forward those recordings of Dalan 'smart

6     remarks' that you have on your cell phone and your in

7     your pen."

8               I think you told me you did not send Ms.

9     McCloskey any recordings; is that correct?

10         A.   Yes.  Yes, sir.

11         Q.   The recordings -- did you make the comment that

12    they were "smart remarks" that Dalan had made?

13         A.   Yes, sir.

14         Q.   And do you recall what those small -- smart

15    remarks were?

16         A.   Not at this moment.  No, sir.

17         Q.   The seven or so recordings that had been

18    provided to me, do you know if those smart remarks on

19    those recordings?

20         A.   No, sir.  I don't think so.  No, sir.

21         Q.   So what happened to those recordings of the

22    smart remarks then?

23         A.   I have moved.  So they might have got lost in

24    me moving.

25         Q.   After just picking back on the timeline here,

Page 58

1    you talked to someone in HR about this issue with Eric;

2    is that right?

3         A.   Yes, sir.

4         Q.   Was that just one occurrence or was their

5    multiple conversations?

6         A.   I can't recall at this moment.

7         Q.   You are aware that Mr. Motes was terminated

8    after you complained, right?

9         A.   Yes, sir.

10        Q.   And you were aware that he was terminated

11   because of your complaint; is that right?

12        A.   Yes, sir.

13        Q.   Were you satisfied that had your complaint had

14   been resolved once he was terminated?

15        A.   With him being terminated, yes.  But how the

16   situation was handled after, no.

17        Q.   We will get to that after our break.  But is

18   there anything else with respect to Mr. Hawkins that you

19   wanted the company to do that they did not do?

20        A.   No, sir.

21             MR. HAWPE:  Mr. Zipkin, if we can take

22   five minutes, that would be appreciative.

23             MR. ZIPKIN:  That's acceptable.  Of

24   course.  Yes.  Can we agree to go off the record then?

25             MR. HAWPE:  That is agreed.

Page 59

```
 1                    THE VIDEOGRAPHER: Time is 11:37.  We are
 2    off the record.
 3                    (Off the record at 11:37 a.m.)
 4                    THE VIDEOGRAPHER:  The time is12:19.  We
 5    are back on the record.
 6                    (On the record at 12:19 p.m.)
 7        Q.    (BY MR. HAWPE) Ms. Smith, we talked about the
 8    Eric Hawkins situation.  And I think -- I don't mean to
 9    put words in your mouth that it was the things after his
10    termination that you had an issue with.
11             Can you explain to me what you meant by that
12    about what happened after Eric was terminated?
13        A.    After Eric was terminated I -- after Eric was
14    terminated, I came into work the following day and I
15    noticed a lot of people were looking at me and staring.
16             And I kind of got a little bit uncomfortable.
17    And that's when I bumped into Devante Scoot 'cause night
18    shift was ending.  And I told Devante I felt very
19    uncomfortable with being at work after the whole Eric
20    situation because of I was being called a liar.
21             And I said that It was hard for me."  And I
22    started crying and Devante advised me to go sit in
23    Frank's office and wait until he got there.  And to have
24    a conversation with Frank on how I was feeling.  When
25    Frank arrived, I told him how I was feeling and that
```

Page 60

1    everyone was looking and I felt uncomfortable.

2          And I told him that I wasn't comfortable with

3    coming back to work.  So he gave me a day off, told me

4    to go home collect myself together and try it again the

5    next day.  But as I went home, I did lay down and as I

6    was laying down, I woke up to my phone going off with a

7    whole bunch of text messages.

8          I began to look at it.  It was a picture of my

9    back area sent out to a lot of people in the warehouse.

10   Some numbers I did not know because their number weren't

11   saved in my phone.  A few of them I did.  With that

12   involving some of the lead man.

13         And with the picture it had the comment of Eric

14   saying "Don't trust these dirty ass hoes."  And people

15   are agreeing.  And they're going back and forth.  And at

16   first, I didn't know what it was because Eric's number

17   is blocked on my phone.  So I didn't know how I wind up

18   getting the messages.  But he made it a group chat,

19   which somehow I wind up being in it.

20         And when I realized what it was about, I went

21   off.  And I told them that "I would be showing it to

22   Frank and HR."  And when I stated that in the messages,

23   that's when they were like "We didn't have nothing to do

24   with it.  I was just added into the group."

25         And I was just like "Yeah.  But y'all are lead

1    men."  And from there, Ethan called, I don't have his

2    last name.  And he called and checked on me and asked if

3    I was okay.  He saw the messages.

4          And he said that when stated that I was going

5    to go to HR, -- ran outside and told everybody to stop

6    responding to the group text messages.  And at that

7    point I told Ethan, it's just very uncomfortable.  I

8    said at this point, they already did the damage.

9          It's already done.  And I said "Now, my number

10   is out to people I don't know."  And when I went off on

11   them -- I cussed them out and I was rude.  But he passed

12   my number out.  From there, I was getting blocked calls

13   and them saying very harmful things.

14         And I brought that up to Frank attention.  And

15   he didn't do much about it.  I tried to file a police

16   report with Laporte Police.  But I -- they never reached

17   back out to me.

18   Q.   So I want to just rewind a little bit, Ms.

19   Smith, you said that after Eric was fired but before

20   this text messages, you know, you started getting them.

21   That you say you felt uncomfortable because people were

22   calling you a liar.

23         Who called you a liar?

24   A.   That was the word around the warehouse.  Darius

25   was the main one 'cause he said that him and Kevin were

                                              Page 62

1    friends.  And now he said that I backdoored and I blamed

2    Eric.

3              And that's where it stem from calling me a

4    liar.  And them not believing me because them saying I

5    did it before.

6         Q.   And I think what you said this is something you

7    heard from other people Darius didn't say this to you,

8    did he?

9         A.   Yes.  Darius did tell me that.

10        Q.   What exactly did he tell you?

11        A.   Darius said that he didn't believe me 'cause I

12   accused Kevin and then now I'm accusing Eric.

13        Q.   And what was your responses?

14        A.   My response was "Why should I have to prove

15   myself?"  And I said "I'm not going to talk to you about

16   it 'cause at the end of the day it was on camera."

17        Q.   The text messages that you were referring to,

18   you said that there was a picture of your backside,

19   right?

20        A.   Yes, sir.

21        Q.   And that picture was of you, right?

22        A.   Yes, sir.

23        Q.   Okay.  Do you know how Eric Hawkins --

24        A.   I spoke to -- we were friends on Social Media.

25        Q.   Okay.  You have to let me finish my question.

Page 63

1    How -- do you know how he got a copy of that picture?

2        A.   We were friends on Social Media.  So I'm

3    guessing he took it off of from there.

4        Q.   Were you friends with other coworkers on Social

5    Media?

6        A.   Yes, sir.

7        Q.   Let me show you what I have marked as Exhibit

8    5.  Let's see.  Do you see Exhibit 5?

9             (Exhibit No. 5 marked.)

10       A.   Yes, sir.

11       Q.   And this is a thread that you produced that is

12   Smith 1 through 4.  And this is the picture that we are

13   talking about.

14            This is the picture that you just described; is

15   that right?

16       A.   Yes, sir.

17       Q.   And Eric says "Be careful who you smoke with.

18   Them ugly hoes play the victim."

19            Do you see that?

20       A.   Yes, sir.

21       Q.   And this is nothing in this message that

22   identifies that this picture is of you, right?

23       A.   No, sir.

24       Q.   Do you know who David Williams is?

25       A.   Yes, sir.

Veritext Legal Solutions
800-336-4000

1        Q.    Who is he?

2        A.    He is a lead man.

3        Q.    Sammy from Valvoline, who is that?

4        A.    He also another employee from Valvoline that

5    was on the day shift.

6        Q.    Do you know what his role was?

7        A.    A Loader/Unloader.

8        Q.    And there was a Valvoline David with a beer mug

9    or some sort of mug there.  Do you know who that is?

10       A.    Yes, sir.  He was also a lead man.

11       Q.    Do you know his last name?

12       A.    No, sir.

13       Q.    I assume you don't know who this 281 number is?

14       A.    No, sir.

15       Q.    And then Willy, who is Willy?

16       A.    Another employee.

17       Q.    Do you know who this 346 area code number is?

18       A.    No, sir.

19       Q.    And, then, this green here at 3:31, is that as

20   you responding?

21       A.    Yes, sir.

22       Q.    And the other green as we scroll through these

23   next couple pages, that is -- those are your responses

24   to the group?

25       A.    Yes, sir.

Veritext Legal Solutions
800-336-4000

```
1          Q.   So when you said that you were -- you went home
2     and that you awakened to all of these group messages
3     with your phone going off, correct?
4          A.   Yes, sir.
5          Q.   Did you do anything that day to report this
6     issue?
7          A.   I forward everything to Frank.  And Frank
8     pretty much said that he was going to talk to HR.  And
9     from there Frank said that "To take another day off.
10    Don't come in that he was going to have a meeting with
11    the crew."  And, then, when I come back that he was
12    going to talk to me.
13         Q.   So you were off then for a couple of days then;
14    is that right?
15         A.   Yes, sir.
16         Q.   And your understanding based on what Frank was
17    saying was that while you were out he was going to talk
18    to your coworkers about this issue; is that right?
19         A.   Yes, sir.
20         Q.   And do you know if that conversation or that
21    meeting ever happened?
22         A.   No, sir.  'Cause I was not at the job.
23         Q.   And, then, after your couple of days off, then
24    do you return back to work?
25         A.   Yes, sir.  I do return back to work.
```

Page 66

1    Everything was running normal as usual.  I had a few

2    people like Romalis came up to and he said he apologize

3    for the stuff that was happening.

4         That it wasn't right.  And he was hoping that I

5    was doing okay.  And I told him I wasn't in the mood to

6    talk about it.  I just want to do my job and go home at

7    this point.

8         Q.   I'm sorry.  Who said that to you?

9         A.   Romalis.

10        Q.   Was there anyone else that you believe that on

11   that group thread that you talked to about this

12   situation.

13        A.   Not to my knowledge, no, sir.

14        Q.   When you report this to Mr.  Harris, did you

15   say that he was going to call HR?

16        A.   May you repeat the question?

17        Q.   Yeah.  Did you say that -- did I hear this

18   correctly, Ms. Smith, that you recorded this message to

19   Frank Harris that Frank said he was going call HR?

20        A.   Yes, sir.

21        Q.   And did anyone from HR ever connect with you

22   about this issue?

23        A.   Yes, sir.

24        Q.   Do you know who that was?

25        A.   I cannot recall at this moment.

Veritext Legal Solutions
800-336-4000

```
 1          Q.   Tell me about the conversation that you had
 2     with HR.  I assume you tell HR person about these text
 3     message; is that right?
 4          A.   Yes, sir.  I did.
 5          Q.   And what did they say in response?
 6          A.   I can't recall at this moment the conversations
 7     that we had.
 8          Q.   At some point, and I don't know if this was the
 9     first conversation or later, but doesn't Frank tell you
10     you should block all of their numbers?
11          A.   Yes, sir.  But I wind up changing my number
12     shortly after.
13          Q.   Did --
14          A.   Um --
15          Q.   Sorry.  Go ahead.
16          A.   But Frank didn't say block the numbers.  He
17     said that "I should delete them off my Social Media.
18     And that I should watch what I say and do around
19     people."
20               And at that point, I felt offended.
21          Q.   Why did you feel offended?
22          A.   Because I was the 1 being attacked and why am I
23     being told to watch what I say or do when they were the
24     initial aggressor.  They didn't even report the
25     situation.
```

Page 68

```
 1          Q.   Well, they -- you said they were the initial

 2     aggressor.  Isn't it true that the initial aggressor was

 3     Eric Hawkins?

 4          A.   I don't know who made the group chat, sir.

 5          Q.   So he's the one that sent the photo, right?

 6          A.   Yes, sir.

 7          Q.   And when he sends the photo he's no longer a

 8     Valvoline employee, right?

 9          A.   Yes, sir.

10          Q.   What did you want the company to do --

11          A.   There were other employees --

12          Q.   Sorry.  Let me finish my question.  What did

13     you want to company to do to Eric Hawkins at that point?

14          A.   They couldn't have done anything.  He was

15     terminated.

16          Q.   And what did you want to company to do to other

17     employees that where on that group thread?

18          A.   That was very unprofessional of them.  And I

19     excepted some sort of disciplinary action to be taken;

20     either a write up or something.

21               Because if the shoe was on the other feet, they

22     would have done the same.  Anybody that didn't bring any

23     information forward.

24          Q.   But when we looked at the text message in

25     Exhibit No. 5 and we looked at Eric's original email or
```

Page 69

1      original text, it doesn't refer to you by name, does it?

2          A.   No, sir.

3          Q.   So, in your opinion, the individuals on that

4      group thread should be disciplined even though they

5      didn't know who's picture they were commenting on?

6          A.   They did know.  They -- Williams and them, they

7      were all on my Social Media.

8          Q.   And, so, because they were on your Social Media

9      that would have known that that picture was you?

10         A.   Yes, sir.

11         Q.   So if they were on your Social Media, you

12     didn't have a problem with them seeing the picture, did

13     you?

14         A.   I blocked them.

15         Q.   After the text message, right?

16         A.   No.  Well, I blocked Eric after the situation.

17     We were not friends on any type of Social Media.  But

18     before then, I already been started blocking my

19     coworkers off of my Social Media.

20              It was a few left.  I have a lot of followers.

21     It's hard to keep track of who is on my page.

22         Q.   And, so, if they were your friend prior to you

23     blocking them, they would have been able to see the

24     picture you put on Social Media, right?

25         A.   Yes, sir.

                                              Page 70

```
 1        Q.   You said that Frank told you he was going talk

 2    to these guys.  And you don't know if that happened or

 3    not, right?

 4        A.   No, sir.

 5        Q.   That first line of the text message, it said

 6    something along the lines of like "Be careful who you

 7    smoke with."

 8             Do you know what Mr. Hawkins meant by that?

 9        A.   Me and Mr. Hawkins smoked.  I smoke cigarettes

10    at the time.  So we did smoke previously before.  But

11    that was a one time deal.

12             And he thought I continued to smoke because I

13    was talking to another employee that did.

14        Q.   And when we say "Smoke," just to be clear, we

15    talking about cigarettes or something else?

16        A.   Cigarettes, sir.

17        Q.   And I'm sorry if I asked you this earlier, Ms.

18    Smith, the individuals that were on this group thread,

19    at any point, did someone come up to you and talk to you

20    about their involvement on the group thread?

21        A.   No, sir.  They just avoided me.

22        Q.   By the way, I just want to go back just for a

23    second.  You said that when you -- when this incident

24    happened with Eric Hawkins that you had to work with him

25    for  a couple of days before his was terminated, right?
```

Page 71

1          A.    Yes, sir.

2          Q.    And you said he was assigning you tasks that

3     you objected to; is that right?

4          A.    Yes, sir.

5          Q.    And why did you object to performing those

6     tasks?

7          A.    Because I finished my task with no help.  The

8     person that was not finishing their task were talking.

9     They were talking.  They were taking multiple breaks.

10          And I made that known to Eric that I will not

11     complete someone's work that's not putting effort into

12     completing their own work.  And he just told me to do

13     the job and get it done.

14          Q.    And while you were doing these tasks, you are

15     being paid to do them, right?

16          A.    Yes, sir.

17          Q.    At some point and I'm not sure on the timeline

18     here --

19                MR. ZIPKIN:  Jeremy, excuse me.  I want to

20     object to that.  That last answer is not clear.

21                MR. HAWPE:  Okay.  That's for the record

22     then.  I don't know what you want me to do with that,

23     Lew.

24                MR. ZIPKIN:  No.  I just want it on the

25     record that you had asked her more than one question by

                                                    Page 72

1    that and I want to object.  Thank you.

2         Q.   (BY MR. HAWPE) Okay.  At some point, Ms. Smith,

3    it's unclear to me on the timeline.  But at some point

4    you moved to the Kiting area; is that right?

5         A.   Yes, sir.

6         Q.   Was that after this incident with Eric Hawkins?

7         A.   Yes, sir.

8         Q.   And tell me what the Kiting area, what you were

9    doing in that area?

10        A.   I was pretty much building pallets, loading

11   pallets on the conveyor belt as we built our personal

12   own kits and we load them on the pallet.  We wrap it and

13   I go store it on the floor or in the racks.

14        Q.   And was that job much different than your prior

15   kind of job as a Loader/Unloader or was it basically the

16   same thing?

17        A.   It was basically the same thing.

18        Q.   And were you physically separate from where you

19   previously worked or was it all together?

20        A.   I was -- I can say separated.

21        Q.   And did you work with another person like were

22   you guys doing the Kiting together or were you by

23   yourself?

24        A.   Yes, sir.  I was working with Katie.  I do not

25   know her last name.  She was over Kiting.  She just

                                              Page 73

1    gives me the directions on what pallet that we are

2    building what location that they belong to.

3         Q.   Did you have any objection to working in the

4    Kiting area?

5         A.   No, sir.

6         Q.   So if I understand if you are a little bit

7    removed from the other area, does that mean you were

8    working in an area that was not going to be side-by-side

9    than these guys on the text thread; is that right?

10        A.   Yes, sir.

11        Q.   At some point in this time period -- and,

12   again, Ms. Smith, you have to tell me when you recall

13   this happen.

14             You complain about having to attend the shift

15   meetings that I think either happened at the beginning

16   of the end of the shift; is that right?

17        A.   Yes, sir.

18        Q.   And which one was that, did it occur at the

19   beginning or the end?

20        A.   Can you repeat the question one more time?

21        Q.   Yes.  These meeting, the shift meetings, did

22   they happen at the beginning or the end of the shift?

23        A.   The beginning of the shift.

24        Q.   And why were -- why were you complaining about

25   attending those meetings?

                                             Page 74

```
1        A.    Because the people from the text message thread

2   were still there.  I was still paranoid and

3   uncomfortable from the blocked and missed calls I was

4   receiving.  And I was told that I -- well, I was not

5   told -- well, from my knowledge when I was moved to

6   Kiting, I was not attending none of the safety meetings

7   while working in Kiting because I was not doing their

8   job.

9             They were picking and Unloading trucks.  I was

10  just with the Kiting and their meetings.  And, from

11  there, I -- out of the blue it was like "Well, she needs

12  to be back in the meetings now."  And I had an issue

13  with that.

14       Q.    And who do you address this complaint to?

15       A.    Frank.

16       Q.    And what was his response?

17       A.    Frank said that I have to attend the morning

18  meeting due to I operate -- I think I operate the

19  forklift.  So it was just me from Kiting going to the

20  morning meeting on the other side of the warehouse with

21  the other employees.

22       Q.    And these meeting safety is sometimes

23  addressed, right?

24       A.    Yes, sir.

25       Q.    And, so, when you said that you were driving a
```

Veritext Legal Solutions
800-336-4000

```
 1    forklift, was he saying that you need to attend these
 2    meetings when there are safety topics?
 3         A.    I don't understand that question.
 4         Q.    Yeah.  I guess I don't understand.  You said
 5    that you had to go because you drove a forklift?
 6         A.    Yes, sir.
 7         Q.    Did he connect the dots there about why if you
 8    drive a forklift you need to be at this meeting?
 9         A.    No, sir.  Not that I can recall at this moment.
10         Q.    And, fair to say, that Katie also didn't want
11    to attend these meetings; is that right?
12         A.    To my knowledge, she was not even going to the
13    meetings at first.
14         Q.    But, then, she ultimately did?
15         A.    Yes, sir.
16         Q.    Do you know why she wasn't attending at the
17    beginning?
18         A.    Well, Kiting wasn't attending Valvoline's
19    morning meeting at all.
20         Q.    You mentioned that after these text messages
21    you began getting a series of calls from blocked or
22    unknown numbers, right?
23         A.    Yes, sir.
24         Q.    Would that leave voice mails?
25         A.    Not that I can recall at this moment.
```

Veritext Legal Solutions
800-336-4000

```
 1          Q.   Did you ever actually answer the phone?

 2          A.   My son did one time.

 3          Q.   And --

 4          A.   And he brought me the phone.

 5          Q.   And what was said by the person on the other

 6    end?

 7          A.   "Your time is coming bitch."  And -- but my

 8    thing is I put it on speaker and my son heard it.  And

 9    by the time I said "Who is this?"  It was already hung

10    up.  And I changed my number.

11          Q.   And to this day, do you know who that person

12    was on the other end?

13          A.   No, sir.

14          Q.   At end of '21, do you go out on the leave of

15    absence, I believe for a car wreck; is that correct?

16          A.   Yes, sir.

17          Q.   When did that car wreck occur?

18          A.   February 28.

19          Q.   Of '21 or '22?

20          A.   I can't recall the exact year.

21          Q.   Well, maybe this will help.  Did you have the

22    car wreck before or after you were employed at

23    Valvoline?

24          A.   I was at Valvoline when I had the car accident.

25          Q.   There was something that you were out for at
```

Page 77

1     the end of 2021 where you had trouble with the company

2     accepting your return to work paperwork.

3            Does that sound familiar?

4     A.    Yes, sir.

5     Q.    And do you remember because I think that that

6     occurred at the end of '21 and if the car accident was

7     in February of '22, then, I'm just wondering if you

8     recall why you were out in '21?

9     A.    In '21, I left to deal with my own issues.

10    Q.    And what issue is that?

11    A.    Yes, sir.

12    Q.    What was the issue that you were dealing with?

13    A.    Even with me working in Kiting, I was still

14    receiving mistreatment from Dalan.  And I just remember

15    that time he walked over I just had a panic attack.  And

16    I called FMLA and I told them that I needed to leave.

17    Q.    And were you granted FMLA leave?

18    A.    Yes, sir.

19    Q.    And do you know how long you took off?

20    A.    For about two months.

21    Q.    And, again, I think you and I are on the same

22    page on this, but tell me if I got it wrong.

23           When you tried to return from FMLA leave that

24    was when it was some issue with your return to work

25    paperwork; is that right?

Page 78

1       A.    Yes, sir.

2       Q.    I want to talk about that.  But you said

3    earlier that you were still being mistreated by Dalan.

4             How was Dalan mistreating you?

5       A.    I wasn't working -- even though I was wasn't

6    working under Dalan, Dalan was still trying to give me

7    assignments.  And even when I was working with the

8    Kiting line, he will pressure like "Hey, I need somebody

9    to clean out this back door."

10            But he was specific on me cleaning -- clearing

11   out the back door.  I said "Okay.  I will have to do it

12   once I'm done doing the Kiting and loading the Kiting.

13   So it was like he just kept calling over the radio.

14            "Hey, when is Angelica going to clear off the

15   back door in the hazmat room?  Like, when is she going

16   to do it?"  Like, pressuring me.

17            Like, stop what you're doing and come clear

18   this out when we have to complete a order that we have

19   to load on a live load.  So it was -- yeah.

20      Q.    Are there any other ways that you believe that

21   he mistreated you?

22      A.    Yes, sir.

23      Q.    How else did he mistreat you?

24      A.    I want to say every say chance that he got.

25      Q.    Ma'am, and I'm asking you for specifics in this

Page 79

1   lawsuit that you brought.

2            Are there any way that Dalan mistreated you?

3   A.   Yes, sir.

4   Q.   In what ways?

5   A.   I can't recall at this moment.

6   Q.   Is there any particular reason that you can't

7   recall?

8   A.   No, sir.

9   Q.   You mentioned that he asked on one occasion for

10  you to clean out the back door; is that right?

11  A.   Clear.  Yes, sir.

12  Q.   What does that mean?

13  A.   Clear out.  There was an exit door that people

14  were shoving material in front of.  And I guess it was a

15  safety hazard where he needed to get to that door.  And

16  instead of asking someone else who had free time, he was

17  very specific on me clearing out the door stopping the

18  work that I was supposed to get finished with.  So I can

19  clear it out.

20  Q.   And how long did it take you to clear it out?

21  A.   I can't recall.

22  Q.   Like, minutes or hours?

23  A.   Hours.

24  Q.   And you thought that someone else should have

25  been tasked or asked to do that?

Page 80

1          A.   Yes, sir.  I already had a full workload.  And

2     I informed him of that.

3          Q.   What did he say in response?

4          A.   It was no response.  I told him over the radio

5     that I was still loading with Kiting and I didn't get no

6     response out of him.

7          Q.   And, so, did you go and clear out the back door

8     then?

9          A.   After I was done with any job, yes, sir.

10         Q.   You mentioned that you were out on Frank for  2

11    months; is that right?

12         A.   Yes, sir.

13         Q.   While you were out on Frank went out on FMLA

14    for about two months; is that right?

15         A.   Yes,sir.

16         Q.   While you were out on FMLA, were you going to

17    any sort of physician or doctor?

18         A.   Yes, sir.

19         Q.   And who was that?

20         A.   Doctor -- she was I seen her over the phone.

21    Dr. Tawbe (sic) is my primary doctor.  And I was also

22    talking to a therapist.  I can't recall her name at the

23    moment.

24         Q.   And were you put on any medication at that

25    point?

Veritext Legal Solutions
800-336-4000

1        A.    Yes, sir.

2        Q.    Do you know what kind of medication?

3        A.    One for my anxiety.  One for Tramadol.  And I

4    don't know the name of the other one.

5        Q.    Do you know what the other one was for?

6        A.    For my depression.

7        Q.    And if I understand this correctly, when you

8    are ready to return to work the discrepancy was you had

9    a piece of paper that indicated you were cleared, but

10   you were also on a medication that might have had drowsy

11   side effects.

12             Do I have that correct?

13       A.    Yes, sir.

14       Q.    And, so, when you were ready to return back to

15   work did someone from the company tell you that they

16   need additional paperwork before you can return?

17       A.    Right.

18       Q.    And, then, did you just go back to your

19   physician to get that paperwork?

20       A.    Yes, sir.

21       Q.    And, then, once you got that paperwork, were

22   you returned back to work?

23       A.    Well, the doctor -- they was having issue fax

24   it from the doctor's office to them.  So it took me to

25   go down to the doctor's office, get it signed, then

                                              Page 82

1    bring it back in person for it to be approved.

2        Q.   And, then, once you bring that paperwork back

3    then you are put back on the job; is that right?

4        A.   Yes, sir.

5        Q.   And, then, fast forward to the beginning of the

6    year, I think you said it was in February that you had

7    your car accident; is that right?

8        A.   Yes, sir.

9        Q.   And my understanding is that you had some back

10   issues after that car wreck?

11       A.   Yes, sir.  Back and leg and shoulder issues.

12       Q.   Is it true that basically after your car

13   accident, you don't really go back to work at Valvoline?

14       A.   Yes, sir.

15       Q.   Did you have to have any surgeries?

16            MR. ZIPKIN:  Jeremy,.  I apologize.  Could

17   you repeat that last question.  It did not come through

18   clearly.

19            MR. HAWPE:  I don't even know what I

20   asked.

21            MR. ZIPKIN:  Something about the car

22   wreck.  Can the court reporter repeat the question and

23   answer?

24            THE REPORTER:  Yes.  Just a moment.

25            MR. ZIPKIN:  You're echoing.

                                        Page 83

```
 1                    (Reporter read back portion.)
 2                    MR. ZIPKIN:  Okay.  Thank you.
 3          Q.   (BY MR. HAWPE) So back to my question, Ms.
 4     Smith, did you have any surgeries after the car
 5     accident?
 6          A.   I had got injections in my back.
 7          Q.   Is that something you are still dealing with
 8     today or has that situation now healed itself?
 9          A.   That situation now heals itself.
10          Q.   You -- the EEOC, you remember filing a EEOC
11     charge against Valvoline, do you not?
12          A.   Yes, sir.
13          Q.   The EEOC produced their file.  It looks like
14     you went to the EEOC at the end of 2021.
15               Does that sound correct to you?
16          A.   Yes, sir.
17          Q.   Why did you go out -- why did you reach out or
18     connect with the EEOC?
19          A.   Because I felt as if the mistreatment in the
20     warehouse was not being addressed properly.
21          Q.   And the mistreatment in the warehouse, is that
22     the mistreatment by Dalan Motes?
23          A.   By Dalan Motes.  Yes, sir.
24          Q.   Is there anyone else that you believe that was
25     mistreating you in the warehouse?
```

Veritext Legal Solutions
800-336-4000

```
1          A.    Not this moment I can't recall.

2          Q.    Did you ever connect with HR about the issues

3     that you were experiencing with Dalan?

4          A.    Yes, sir.  And I didn't feel as if they

5     believed me.  So that's when I took it to EEOC.

6          Q.    And do you remember who you connected within

7     HR?

8          A.    No, sir.  Not at this moment, I can't.

9          Q.    You said that "You felt like they didn't

10    believe you," why did you come to that conclusion?

11         A.     'Cause for one when I did tell them I was

12    recording Dalan, she said "Did I inform him of it?"  She

13    stated that "If I am recording, that I need to inform

14    Dalan that I'm recording."

15              That's when I told her "I don't feel if I need

16    to if I'm the one that feels uncomfortable or feels

17    threatened."  And even when I tried to tell her about

18    what was going on in the warehouse, she made a comment

19    saying, "Well, it look like you have a vendetta against

20    your employees.  It is what it is."

21              And, from there, I lost all trust in her

22    because of you are turning it around and making it as if

23    I'm the bad person.  And I'm coming to you with problems

24    that I'm having in the warehouse.

25              And you are turning it around as if as if hate
```

Page 85

```
 1    my coworkers.  And I do not.
 2        Q.    You told this HR person that you have
 3    recordings of Dalan that would back up your complaints,
 4    right?
 5        A.    Yes, sir.
 6        Q.    And you never produced those to HR?
 7        A.    No, sir.
 8        Q.    I want to show you Exhibit No. 6 here.  All
 9    right.  Do you see Exhibit No. 6 on your screen?
10               (Exhibit No. 6 marked.)
11        A.    Yes, sir.
12        Q.    And this is the charge of discrimination that
13    you filed?
14        A.    Yes, sir.
15        Q.    There is a couple of lines in here that I just
16    -- I can blow it up a little bit here.  But I want to
17    briefly discuss with you.  Scroll up here a little bit.
18               You see right here where my cursor is where it
19    says "Immediately?"
20        A.    Yes, sir.
21        Q.    It says "Immediately after I reported it to
22    Dalan he started to harass me by making mentions of
23    'everyone needs to work' in a safety meeting."
24               You see that?
25        A.    Yes, sir.
```

1     Q.   Can you tell me anymore context about when

2   Dalan said "Everyone needs to work?"

3     A.   I can't recall at this moment.

4     Q.   A few lines down it starts here with "However."

5   It says "However, Dalan continued to harass me, always

6   picking on me saying to me it's just your mental

7   health."

8          Do you see that?

9     A.   Yes, sir.

10     Q.   Were there any witnesses to this statement?

11          MR. ZIPKIN:  Objection.  You may answer.

12     A.   Not that I can recall at this moment.

13     Q.   (BY MR. HAWPE) Had you disclosed to Dalan that

14   you were having any mental health issue prior to him

15   making that comment or that statement?

16     A.   No, sir.

17     Q.   When you were out for your car accident were

18   you -- well, let me just ask a different question.

19          You sent a text message to Mr. Frank Harris

20   indicating that you were going resign.  Do you recall

21   that?

22     A.   Yes, sir.

23     Q.   And I'm going show you what I've marked as

24   Exhibit No. 7.  Exhibit No. 7 is Valvoline Smith 8 and

25   9.  And take a second and look at Page 2 of Exhibit No.

Page 87

```
 1    7.
 2             And let me know when you've had a chance to
 3    look at that.
 4                 (Exhibit No. 7 marked.)
 5    A.    Yes, sir.
 6    Q.    And I get that this is an email format, Ms.
 7    Smith.  But is this the contents of the text message
 8    that you sent to Mr. Frank Harris?
 9    A.    Yes, sir.
10    Q.    I want to go through this just briefly here.  In
11    the third paragraph that says "I have been sexually
12    harassed, harassed, intimidated, treated differently
13    than other employees, and made fun of by my mental
14    health by Dalan for months.
15             And when I tried to report it to HR and report
16    it to my lead man, he made my work environment hostile."
17             Do you see that?
18    A.    Yes, sir.
19    Q.    And let's kind of start at the back when you
20    say "I report it to my lead man and he made the
21    environment hostile."
22             Who is the lead man you are referring to?
23    A.    At the time, it was Eric and EJ.
24    Q.    So after Eric is terminated, does EJ become
25    your lead man?
```

Page 88

1        A.    Yes, sir.

2        Q.    And is it your testimony that EJ made your work

3    environment hostile?

4        A.    No, sir.

5        Q.    On the -- so -- when you are referring here to

6    lead man made my work environment hostile, you are

7    referring to Eric, right?

8        A.    Yes, sir.

9        Q.    In that first sentence of Paragraph 3, you say

10   "I have been sexually harassed, harassed, intimidated,

11   treated differently than other employees."  Let's just

12   stop there.

13            I've asked you a lot of questions this morning,

14   Ms. Smith, are there any other ways sitting here today

15   that you believe that you were harassed, intimidated,

16   and treated differently than other employees at

17   Valvoline?

18       A.    Yes, sir.  I can't recall at this moment.

19       Q.    Why are you suing Valvoline?

20       A.    Because the mistreatment.

21            MR. ZIPKIN:  Objection.  You may answer.

22       A.    May you repeat the question?

23       Q.    (BY MR. HAWPE) Yeah.  Why are you suing

24   Valvoline?

25       A.    Because of the mistreatment that I received

Page 89

1    while working at the job.

2         Q.   And have you told me all the ways of

3    mistreatment?

4         A.   No, sir.

5         Q.   And -- well, what other ways were you

6    mistreated?

7         A.   I can't recall at the moment.  Sir it has been

8    a while.

9         Q.   And you understand that you have sued the

10   company for this mistreatment.  And, so, your testimony

11   is you don't recall all of the ways you were mistreated?

12        A.   The mistreatment from my situation how it was

13   being handled.  Me, complaining to Frank and HR about

14   Dalan.  Them not believing me.  Me, having to pick up

15   other people work load because they don't want to do it.

16             Me, as trying to ask Dalan for help and he

17   don't want to help.  Yes.  I was mistreated differently

18   from others.

19        Q.   You know that Dalan resigned his employment in

20   January of '22, don't you?

21        A.   No.  All I know that he had found him another

22   employer.  That's the only thing I was told.

23        Q.   And, so, even before your car wreck, Dalan was

24   no longer working at Valvoline, right?

25        A.   No, sir.

                                                Page 90

1      Q.   He was working there when you had your car

2    wreck?

3      A.   No, sir.

4      Q.   What were you looking for the company to do to

5    Dalan with respect to the situation and the issues that

6    you were having with him?

7      A.   I thought that he would have lost his job for

8    mistreating -- mistreating me.  But that didn't happen.

9      Q.   So I know I asked you about Kevin.  You said

10   that when Kevin lost his job, that's not something that

11   you necessarily wanted, right?

12     A.   No, sir.  I wouldn't want anyone to lose their

13   job.

14     Q.   But you just testified that you wanted Dalan

15   Motes to lose his job, right?

16     A.   Yes, sir.  Because he was treating me unfairly.

17     Q.   And treating you unfairly, in your mind, was

18   worse than the touching?

19     A.   No, sir.

20     Q.   So why did Dalan, in your opinion, deserve to

21   be fired but Kevin did not?

22     A.   Because he continuously to do it.  With the

23   situation that happened within a blink of a eye, I was

24   dealing with Dalan and his behavior for months.

25     Q.   And you've told me about the behavior that you

Veritext Legal Solutions
800-336-4000

1    can remember, right?

2        A.   Yes, sir.

3        Q.   When you resigned in April of '22, Dalan had

4    been gone from Valvoline for a few months at that point,

5    correct?

6        A.   Yes, sir.

7        Q.   So if you had an issue with Dalan and he was no

8    longer, there why were you not comfortable returning

9    back to work at Valvoline?

10       A.   I was uncomfortable working with them

11   coworkers.  I no longer felt comfortable at that job.  I

12   was humiliated.  I didn't want to go back to that job.

13            I was planning on looking for another job until

14   I had the accident.

15       Q.   And why did you feel humiliated?

16       A.   Walking in to work, everybody knows your

17   number.  They seen the picture.  That know that it's

18   you.  Everything that happened, it was hard for me to

19   work in to that building everyday.

20       Q.   But if I heard you correctly, Ms. Smith, this

21   was a photo that you put on Social Media, right?

22       A.   Yes, sir.  And I keep my Social Media private

23   from my work life.

24       Q.   But you had allowed other coworkers to be your

25   friend, right?

Page 92

1        A.    And I took them off.

2        Q.    I'm going to show you Exhibit No. 8.  Take a

3    look at Exhibit No. 8 and let me know when you've had a

4    chance to look at that.

5                (Exhibit No. 8 marked.)

6        A.    Yes, sir.

7        Q.    And Exhibit No. 8 on email from Mr. McCloskey

8    to you.  For the record, it's Bates Stamped Valvoline

9    Smith 1 and 2.

10               Did you get this email that Mr. McCloskey sent

11    on April 8th, 2022?

12        A.    Yes, sir.

13        Q.    And you did not respond to it, did you?

14        A.    Not that I can recall.

15        Q.    Why did you not respond?

16        A.    Because damage has already been done.  I didn't

17    feel comfortable walking in that warehouse anymore.

18    What more could they do to make me feel comfortable

19    working in a place and working around them coworkers?

20        Q.    We talked about the comments that Kevin made

21    about you earlier this morning.  And we talked about the

22    comment that Eric Hawkins made.  So I want to ask a

23    little bit of a different question.

24               Did anyone else as far as you are aware make

25    any derogatory comments about you from Valvoline?

                                                    Page 93

1      A.   No, sir.

2      Q.   Did anyone other than Mr. Hawkins and Mr.

3  Williams make any sex related comments about you?

4      A.   No, sir.

5      Q.   When you resigned from Valvoline, did you have

6  another job lined up that point?

7      A.   No, sir.  I was doing hair at the time.  Then I

8  stopped because I was having shoulder issues.

9      Q.   You were never demoted at Valvoline; is that

10 right?

11     A.   Yes, Sir.

12     Q.   And while you were moved around to different

13 areas, your title was always the same Loader/Unloader?

14     A.   Yes, sir.

15     Q.   Did you enjoy working in the Kiting Department?

16     A.   Yes, sir.

17     Q.   Why did you enjoy that work?

18     A.   Because I was away from the other coworkers.  I

19 was mostly working with temps.  They had a better

20 environment over there.

21          They were friendly, they respected each other.

22 So, yes, sir.

23     Q.   We talked a little bit about your pay.  Your

24 pay was never cut at Valvoline, was it?

25     A.   No, sir.

Page 94

1      Q.   The incident that you mentioned with clearing

2   the back door, was that a job that someone else should

3   have been assigned?

4      A.   Yes, sir.

5      Q.   Let me ask -- and who was that?

6      A.   Any of the people on the shipping side because

7   usually when stuff needed to be unloaded in the

8   receiving dock they grab someone from the shipping deck

9   that is standing there.  And they usually go handle

10  tasks that need to be done.

11     Q.   Would that have been another Loader/unloader to

12  do that?

13     A.   Yes, sir.

14     Q.   You mentioned Social Media.  Do you know where

15  the picture was from?  Was it from Instagram, Facebook

16  or could have been either one?

17     A.   I posted it on Snapchat and Facebook.

18     Q.   Were you ever friends with Dalan Motes on

19  Facebook?

20     A.   No, sir.

21     Q.   Have you ever gone and looked at Dalan Motes's

22  Facebook page?

23     A.   No, sir.

24     Q.   I want to walk through some names that are in

25  your disclosures.  Jarvis Wright, he was Production

Page 95

```
 1        I, ANGELICA SMITH, have read the foregoing
 2     deposition and hereby affix my signature that same
 3     is true and correct,  except as noted as above.
 4
 5
 6                     _____
 7                     ANGELICA SMITH
 8
 9
10     STATE OF _____   *
11     COUNTY OF _____   *
12
             Before me, _____, on this day
13
       personally appeared ANGELICA SMITH, known to me,(or
14
       proved to me under oath or through_____)
15
       (description of identity card or other document) to
16
       be the person whose name is subscribed to the
17
       foregoing instrument and acknowledged to me that
18
       they executed the same for the purposes and
19
       consideration therein expressed.
20
             Given under my hand and seal of office
21
       this _____ day of _____, _____.
22
23                     _____
                       NOTARY PUBLIC IN AND FOR
24                     THE STATE OF _____
                       COMMISSION EXPIRES:_____
25
```

Page 111

```
 1              IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION
 3     ANGELICA B. SMITH              )
                                      )
 4                                    )
       V.                             ) CIVIL ACTION NO:
 5                                    ) 4:22-CV-02472
                                      )
 6     VALVOLINE, LLC                 )
 7
 8
                 REPORTER'S CERTIFICATION FROM THE
 9
                 ORAL AND VIDEOTAPED DEPOSITION OF
10
                         ANGELICA SMITH
11
                         OCTOBER 9, 2023
12
13              I, Ardenia Hunt, a Certified Shorthand
14     Reporter in and for the State of Texas, hereby
15     certify to the following:
16              That the witness, ANGELICA SMITH, was duly
17     sworn by the officer and that the transcript of the
18     oral deposition is a true record of the testimony
19     given by the witness;
20              That the deposition transcript was submitted
21     on _____, to the witness, or to the
22     attorney for the witness, for examination, signature,
23     and return to me by _____;
24              That the amount of time used by each party at
25     the deposition is as follows:
```

                                                Page 112

1          Mr. Jeremy Hawpe -2 HOURS, 20 MINUTES

2          Mr. Lewis Zipkin - 0 HOUR, 5 MINUTES

3

4          That pursuant to information given to the

5     deposition officer at the time said testimony was

6     taken, the following includes counsel for all parties

7     of record:

8

                    ATTORNEY FOR PLAINTIFF:

9

                    ZIPKIN WHITING

10

11                  ATTORNEY FOR DEFENDANT:

12                  LITTLER MENDLESON

13

14          I further certify that I am neither counsel

15     for, related to, nor employed by any of the parties

16     or attorneys in the action in which this proceeding

17     was taken, and further that I am not financially or

18     otherwise interested in the outcome of the action.

19

20       Further certification requirements will be certified

21     to after they have occurred.

22

23       Certified to by me this the 2nd day of November,

24     2023.

25

                                        Page 113

1

2      ARDENIA HUNT, CSR No. 8812

       Expiration Date: 05-31-25

3      Veritext Legal Solutions (571)

       300 Throckmorton, Suite 1600

4      Fort Worth, Texas 76102

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 114

1                   FURTHER CERTIFICATION
2
          The original deposition was _____ was not _____
3
     returned to Veritext Legal on _____,
4
      20_____.
5
                 If returned, the attached Corrections and
6
     signature page contains any changes and the reasons
7
     therefor;
8
                 If returned, the original deposition was
9
     delivered to Jeremy W. Hawpe, custodial Attorney;
10
                 That $_____ is the deposition officer's
11
     charges to the Defendants for preparing the original
12
     deposition transcript and any copies of exhibits;
13
14
15                 That the deposition was delivered in
16   and that a copy of this certificate was served on all
17   parties shown herein.
18
19
                 Certified to by me this _____ day of
20
      _____,2023.
21
22                                  ARDENIA HUNT, CSR No. 8812
23                                  Expiration Date: 05-31-25
                                    Veritext Legal Solutions (571)
24                                  300 Throckmorton, Suite 1600
                                    Fort Worth, Texas 76102
25

                                             Page 115

1   Mr. Lewis Zipkin, Esq., Lawsmatter@gmail.com

2                      November 2, 2023

3   RE: Smith, Angelica B. v. Valvoline, LLC, Et Al.

4   DEPOSITION OF: Angelica Smith (# 6148871)

5        The above-referenced witness transcript is

6   available for read and sign.

7        Within the applicable timeframe, the witness

8   should read the testimony to verify its accuracy. If

9   there are any changes, the witness should note those

10  on the attached Errata Sheet.

11       The witness should sign and notarize the

12  attached Errata pages and return to Veritext at

13  errata-tx@veritext.com.

14       According to applicable rules or agreements, if

15  the witness fails to do so within the time allotted,

16  a certified copy of the transcript may be used as if

17  signed.

18                      Yours,

19                      Veritext Legal Solutions

20

21

22

23

24

25

                                    Page 116

# EXHIBIT D-1

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974  See enclosed Privacy Act Statement and other information before completing this form | EEOC  FEPA | 460-2022-00081 |

| Texas Workforce Commission Civil Rights Division | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| Ms. Angelica B. Smith | (832) 763-1107 | 1993 |

**Street Address**

3909 Burke Rd #5206

PASADENA, TX 77504

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| VALVOLINE | 15 - 100 Employees | (800) 825-8654 |

**Street Address**

1302 Wharton Weems Blvd

LA PORTE, TX 77571

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | Earliest | Latest |
| Disability, Retaliation, Sex | 08/05/2021 | 01/10/2022 |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am currently employed with Respondent.  On August 5, 2021, I was sexually harassed by an employee named Eric.  He grabbed my butt and also made sexual comments about my butt.  He asked me to go out, but I refused. Because I refused, he acted hostile towards me, by assigning me work, but not the others.  Eric had supervisory authority to assign me work.  I complained to First Shift Supervisor Dalan and to Warehouse Supervisor Frank.  Immediately after I reported it to Dalan, he started to harass me by making mention of "everyone needs to work" during a safety meeting. After it was investigated, Eric was suspended from his job.  However, in a group chat, Eric, Lead Man Dave, and other co-workers harassed me, by calling me derogatory names, showing photos of me that was not provided by me, and making jokes.  I did complain because I was emotional and I was humiliated by so many employees.  Ultimately, Eric was discharged on August 27, 2022, after so many days of putting up with the harassment. However, Dalan continued to harass me, always picking on me, and saying to me, "it's just your mental health". Others have complained about Dalan.  Because I was subjected to a severe and hostile work environment, I was out on leave.  I tried to return to work, but Dalan stated that I wasn't cleared to return.  I believe he did this because corporate was in the work area, investigating Dalan.  Frank made it difficult for me to return to work. Dalan resigned on January 10, 2022. I believe that I was discriminated against, because of my sex (female), retaliated against for making a complaint,

| I want this charge filed with both the EEOC and the State or local Agency, if any   I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT |
| **Digitally Signed By: Ms. Angelica B. Smith**  03/15/2022       *Charging Party Signature* | SUBSCRIBED   AND   SWORN   TO   BEFORE   ME   THIS   DATE *(month, day, year)* |

**EXHIBIT**

**6**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974  See enclosed Privacy Act Statement and other information before completing this form | EEOC<br>FEPA | **460-2022-00081** |

| | |
|---|---|
| **Texas Workforce Commission Civil Rights Division** | and EEOC |
| *State or local Agency, if any* | |

in violation of Title VII of the Civil Rights Act of 1964, as amended, and because I was regarded as an individual with a disability, in violation of the ADA Amendments Act of 2008.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any   I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Digitally Signed By: Ms. Angelica B. Smith**<br><br>**03/15/2022** | SUBSCRIBED   AND   SWORN   TO   BEFORE   ME   THIS   DATE<br>*(month, day, year)* |
| *Charging Party Signature* | |

VALVOLINE (SMITH) 000108